AND

## THE CORRECTION OF ERRORS

OF THE

## STATE OF NEW-YORK,

IN MARCH, 1808.

---

WILLIAM ROGERS and ANN his Wife, *Appellants,*

*against*

BERTRAM P. CRUGER, HENRY N. CRU-
GER, NICHOLAS CRUGER, WILLIAM
BARD and MARY his Wife, HENRY
CRUGER and CATHARINE his Wife,
WILLIAM HEYWARD and SARAH his *Respondents.(a)*
WIFE, ANN TOWERS, MARGARET
TOWERS, CATHARINE TOWERS and
MARY TOWERS;

*IN ERROR.*
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

THE appellant *Ann,* formerly *Ann Cruger,* exhibited her bill in the court of chancery, on the 18th of *May,* 1801, stating, that her late husband, *Nicholas Cruger,*

Where *T.* a *feme sole,* residing in *St. Croix,* in *October,* 1800, gave a power of attorney to *A. & Co.* to act for her, in regard to her share of the estate of *C.* of *New-York,* deceased, of whom she was one of the heirs, and, afterwards, in *April,* 1801, the answer of *T.* to a bill in chancery, filed relative to the estate of *C.*

(a) This case ought to have been printed in the *fourth* volume of these reports, but want of room prevented its insertion, at the time, and it was afterwards intended to be omitted altogether; but as it has been supposed to involve the decision of some points of importance, which may be useful to the profession as well as in the final decision of the controversy between the parties, it is now reported. Though the case has been much abridged, its length, it is to be feared, remains more proportioned to the magnitude of the property in controversy, than to the importance of the legal questions brought into discussion.

4 B

*IN ERROR.*
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

deceased, was seised and possessed of a very consider-able real and personal estate, and on the 22d day of *Fe-bruary*, 1791, duly made and published his last will and testament; by which, after directing his debts to be paid, and directing his executors to make an inventory of his estate, as soon after his death as convenient, he devised as follows :

" I give and bequeath to my respectable and aged un-cle, *John Cruger*, Esq. the annual sum of one hundred and fifty pounds during his natural life, the first payment to be made to him in one year after my death, and on that day yearly during his natural life. *Item.* The rest and residue of my estate, both real and personal, I will and devise, in manner following, that is to say; I give, devise, and bequeath one third part thereof to my be-loved wife, *Ann Cruger*, and to her heirs and assigns for ever ; and it is my will that my said wife may, if agreeable to her, take the said one third part thereof out of such part or parts of my estate, real and personal, or out of either of them as she may choose, so that on a fair and equitable valuation or appraisement of the same, the said part or parts she shall so choose, shall not toge-ther exceed the value of one third of my said real or personal estate, as first above devised and bequeathed to her. *Item.* I give to my said wife and to her executors and administrators, all her wearing apparel, rings, jew-els, and other personal ornaments whatsoever. *Item.* I give, devise, and bequeath the remaining two third parts of my estate, both real and personal, to my children, sons and daughters, as well those of my first mar-riage, as those of my second, (they being all equally near and dear to me,) to be divided among them share and share alike. And I do hereby order my executors,

*Marginal notes:*

was signed by *A.* with the name of *A. & Co.* as attorneys of *T.*, but with-out any know-ledge of the marriage of *T.*, or revocation of the power; it was held that the answer was not properly signed or put in, and that the subsequent pro-ceedings were, therefore, irre-gular.

*It seems*, that a general power to act relative to the management of an estate, does not autho-rize the attor-ney to put in an answer for his principal to a bill in chancery relative to it; and that an-swers to bills in chancery must be signed by the party, and put in under oath.

An infant can-not bind himself by his own as-sent, nor even by the consent of a guardian, unless his acts are deemed by a court of chance-ry beneficial to the infant.

Where *C.* by his last will and testament, devised one third of all his estate to his wife, to be taken out of such parts of the estate, real or personal, as she might elect, so that on a fair and equitable valuation and appraisement of the same, the parts she should choose, should not exceed the value of one third of his estate, &c. under an order of the court of chancery the whole of the estate, real and personal, of *C.* was valued and appraised by three persons, appointed and sworn as appraisers, and the widow made her election of parts of the real and personal estate amounting to one third of such appraised value. At the in-stance of the heirs and devisees, the appraisement was, afterwards, set aside, on the ground of a gross mistake of the appraisers in calculating the value of a certain part of the real estate, connected with other circumstances in the case, though no actual misconduct or fraud was to be imputed to the appraisers.

*IN ERROR.*
.....
ALBANY,
March, 1808.

Rogers and
Wife
v.
Cruger and
others.

hereinafter named, to pay to each of them their said separate shares on their arriving to the age of 21 years; but should any or either of my said children, die before his, her, or their age of 21 years, and without issue, then it is my will, that his, her, or their share or shares, lapse, and that the same go to and be equally divided among his or their surviving brothers and sisters, or such of them as survive, share and share alike. And whereas by the death of my first wife in the island of *St. Croix*, the laws of *Denmark* and that island entitled my children by my first wife, to a certain part of my estate in the said island of *St. Croix*, and elsewhere. To the intent, therefore, that my children by my present wife, receive an equal share with the children by my first wife; it is my will and desire, that that part of my estate shall be considered as part of the two thirds of my estate as above given, devised and bequeathed to all my children. But if my said children, or either of them, by my first wife, shall take and receive to his, her or their separate use, the aforesaid part of my estate in the island of *St. Croix*, or elsewhere, which, by the said laws thereof, and those of *Denmark*, they are entitled to, then it is my will, and I hereby order and direct, that it be considered as taken and received as part of his, her or their legacies or legacy herein devised and bequeathed to them, and each of them ; but should their separate shares of that part of my estate amount to as much as the whole of his, her, or their legacies so as aforesaid devised to them and each of them, that then it be considered as taken and received in full satisfaction thereof. *Item.* I hereby nominate, constitute and appoint my beloved wife, *Ann Cruger*, executrix, and my respected friends, *Robert Watts*, *John Watts*, and *Cornelius Stevenson*, all of the city of *New-York*, Esqrs. executors of this my last will and testament. *Item.* It is my will that my said executors, as soon after my death as my said wife shall choose, assign and convey to her the one third part of

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

my estate, real and personal, as herein before devised and bequeathed to her, and in manner and form as is therein mentioned. *Item.* I hereby give full power and authority to my said executors, and the survivors and survivor of them, to manage, repair, and improve all my estate, both real and personal, to the best advantage, for my several devisees and legatees; and at their discretion to sell both real and personal estates, or lease or rent the same, and the moneys thereon arising to lend and place out at interest upon good and sufficient security, either real or personal, as my said executors or the survivors and survivor of them shall think proper, and that so much of the income or interest thereof on the separate shares of my said children, as will be necessary and sufficient for their and each of their support and education during their and each of their infancy, it is my will, and I hereby order and direct that my executors pay the same to them, or for their use, either annually or otherwise, as occasion or their said necessities may so require. And that if the interest or income of their and each of their shares of my said estate, shall be more than sufficient for the purposes of their and each of their education and support during their infancy, then it is further my will that the balance or overplus thereof, be also placed out at interest, (as it shall arise,) on good security, for their and each of their separate use, and that the same be paid to each of them at the times and in the manner their and each of their legacies are herein before directed to be paid. And to the end that my executors may the better perform this my will, I do hereby give them full power to bargain, sell, dispose of, and convey all or any part of my real estate, in any part of the world, to any person or persons, or body corporate, and to his, her, or their heirs and assigns for ever, in fee-simple; and one or more deeds for the same to execute and deliver, as such sale or sales may require; and at their discretion to submit to arbitration, compromise,

and settle all and every or any differences and disputes that may arise in and about the execution of this my last will and testament," &c.

In *November*, 1799, the testator, with his wife, went to *St. Croix*, where he had formerly resided, and died there in the *March* following. Before his death, on the 16th of *January*, 1800, he made the following codicil to his will:

" Whereas, from indisposition, as well as from other causes, I have found it necessary to return to this island, where part of my property lies, arising from inheritance in right of my first wife, *Ann Cruger*, born *De Nully*, and my present wife, *Ann Cruger*, born *Mackoe*, both or neither of which are mentioned or included in my preceding will, have thought it necessary to make the following arrangement in this codicil with respect to said property, intending the same to be as binding, and as of full effect, as all and every clause in my said preceding will, bearing date the 22d *February*, 1791, viz. it is my wish and desire, that the children of my above-mentioned first wife shall inherit and receive to themselves only, all that part or share of the property coming to me from the joint estate of Major and Madame *De Nully*, in right of my marriage with their daughter, leaving to my sons and daughters, by said marriage, the whole thereof, to be equally divided between them, the daughters to have equal shares with the sons. It is also my will and desire that the whole of the property coming to me from the estate of *Isaac* and *Elizabeth Mackoe*, shall be and remain the whole and sole property of my beloved wife, *Ann Cruger*, during her natural life, and to be at her entire disposal after the same, so that she shall not be accountable to any person whatever, for any disposition she may think proper to make of the same.

" And I have also thought it proper that some person in this island should be joined with my executrix and executors named in my said will above mentioned. I do hereby nominate and appoint Mr. *William H. Krause* to

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
·····
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER
and others.

act jointly with my before-mentioned executors and exe-cutrix. Finally, ratifying this codicil, and declaring it of as full effect and validity as my will frequently before mentioned. In witness," &c.

The bill further stated, that *Robert Watts*, *John Watts*, *Cornelius Stevenson*, and *William H. Krause*, had refused to act, or qualify as executors of the said will, or to do, or join in any acts they, as executors, were therein empowered to do; and thereupon *Ann*, the widow of the testator, had exhibited and proved the said will and codicil, and took upon herself the sole administration thereof. That she had afterwards also caused the said will to be proved in the supreme court, according to the statute in such case provided, and the same was therein recorded according to law; but that the codicil not being executed in the " presence of three witnesses," could not be proved and recorded, as a will affecting real estate. The heirs of the testator were *Bertram P. Cruger*, *Henry N. Cruger*, *Nicholas Cruger*, *Betsey Towers*, *Catharine Cruger*, and *Polly Cruger*, by his first wife; and one daughter by the respondent *Ann*, named *Sarah*, and married to the respondent, *William Heyward*, on the 25th *May*, 1804. *Catharine* married the respondent, *William Bard*, in *October*, 1802, and *Mary* married the respondent, *Henry Cruger*, in *September*, 1782. *Catharine*, *Polly* and *Sarah* were under twenty-one years, at the death of the testator. The executors having refused to execute any of the powers or trusts thereby vested in them, there was no person who could make or execute, or from whom the said *Ann* could receive the assignments and conveyances of the share of real or personal estate to her thereby devised and directed to be made; and that by reason of the infancy of some of the heiresses of the said *Nicholas Cruger*, deceased, no valid agreement could be made for the appraisement and valuation of the said real estate, without the aid of a court of equity; by which the

said *Ann* was in danger of being deprived of the right of electing her one third of the real and personal estate, or of having the same so vested in her, so as to be free from the risk of litigation thereafter. That she had applied to the heirs for this purpose, who did not object to her requests, but as some of them were infants, *who could not bind themselves by their assents*, they were desirous of receiving the direction of the court of chancery; and the bill prayed that appraisers might be appointed to value the real and personal estate of which the said *Nicholas Cruger*, deceased, was seised and possessed when he made his will, and at the time of his death; that her right to elect one third part in the real and personal estate, or out of either of them, as she might choose, might be confirmed to her and her title thereto established, and process of *subpœna* issue against the heirs. The bill was filed in the office of *Isaac L. Kip*, as the plaintiff's clerk in court.

It appeared that the appellant *Ann*, after her return to *New-York*, in *October*, 1800, divided the sum of 58,453 dollars and 37 cents, between herself and the children of the testator, according to their respective shares.

In *October*, 1800, *Elizabeth Towers*, with the consent of her curator, *Alexander Maitland*, sent a full power of attorney to *John Nixon* and *David Walker*, merchants in *Philadelphia*, to act for her in regard to her proportion of the testator's estate; and in *April*, 1801, she and the said *Maitland* intermarried.

To this bill was put in an answer, purporting to be by *Bertram P. Cruger*, *Henry N. Cruger*, *Nicholas Cruger*, and *Betsy Towers;* who therein admitted the will and codicil of their father as set forth in the bill, and that the same was proved by the said *Ann*, as sole qualified executrix, the executors having refused to act. That the said *Ann* did apply to them to have the estate appraised, and that they did not object to any safe and equitable method of having the said estate appraised and valued,

IN ERROR.
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

and submitted themselves to the court. This answer was subscribed as follows :

"BERT. PETER CRUGER,"

"HENRY N. CRUGER,"

"NICHOLAS CRUGER."

"JOHN NIXON & Co. Attorneys }
for Mrs. TOWERS."

"SAMUEL M. HOPKINS, *Solicitor for defendants*."

Taken by consent, without oath.

Filed 17th of *May*, 1801, in the office of *Thomas Smith*.

On the 14th day of *May*, 1801, in a cause entitled, " *Catharine Cruger, Polly Cruger*, and *Sarah Cruger ;* who are impleaded with others at the suit of *Ann Cruger*, executrix," &c. an order was made, " that *Isaac L. Kip*, Esq. one of the clerks of this court, be appointed guardians for the said infants *in this cause*, by whom they may appear and answer." The said infants, *Catharine, Polly* and *Sarah*, by the said *Isaac L. Kip*, their guardian, put in an answer to the said bill, marked by the clerk to have been filed also on the 17th day of *May*, 1801, in which they say they believe the matters in the bill mentioned are true. That they had not objected to any safe and equitable mode of having the estate appraised, but as they are infants, incapable of assenting to any acts by which their inheritance shall be affected, they submit themselves to the judgment of the court, whose peculiar province it is to protect the right of infants, in the premises, and humbly hope their rights will be protected and preserved.

SAML. M. HOPKINS,
solicitor for defts.

Taken without oath, by consent.

It appeared that the appellant *Ann*, and the respondents, *B. P. Cruger* and *Henry N. Cruger*, the only two heirs then of age, and in *New-York*, and who, it was under-

stood, acted for all the children, except *Sarah Heyward*, agreed to take the opinion of Mr. *Harison* and Mr. *Hopkins*, as counsel for all parties; and they advising an *amicable* suit in chancery, by the appellant *Ann*, against the children, it was agreed that Mr. *Hopkins* should appear as solicitor, and Mr. *Harison* as counsel, and that the latter should sign the pleadings, on the part of the complainant, and the former those on the part of the defendants; and that all the answers might be put in without oath. When the answers were put in, it was not known that *Elizabeth Towers* had married.

On the 18th day of *May*, 1801, on the motion of Mr. *Harison*, and by consent of Mr. *Hopkins*, it was ordered that *Nicholas Low*, *Henry Rutgers*, and *John De Wint*, be appointed to appraise and value the real and personal estate, whereof the said *Nicholas Cruger* died seised or possessed; that they take an oath, faithfully to execute the trust reposed in them by this order, and then proceed to appraise and value all the real and personal estate, whereof the said *Nicholas Cruger* died seised or possessed; distinguishing the separate values of each parcel of real property, and of each species of personal property, and report without delay.

On the 16th day of *June*, 1801, on reading an affidavit that *Henry Rutgers* and *John De Wint* could not attend to the duties of their appointment, *Abijah Hammond* and *John Lawrence* were appointed in their places, and any two of them had power to act. The three appraisers took an oath as required, on the 8th day of *July*, 1801.

On the 17th of *November*, 1801, the appellants, *William Rogers* and *Ann*, intermarried, and about ten days thereafter went to the island of *St. Croix*, and did not return until *July*, 1802.

On the 26th of *March*, 1802, *William Rogers* and *Ann* his wife filed their bill, stating the proceedings above

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others

mentioned; and referring thereto, further, set forth that since those proceedings *Betsey Towers* had died, leaving *Ann Towers*, *Peggy Towers*, *Catharine Towers* and *Mary Towers*, her children and heirs; and that on or about the 17th day of *November*, 1801, the said *William* and *Ann* intermarried, and the said cause was thereby abated: but that the plaintiffs having jointly the same right which the said *Ann* had before, the bill prays that the said suit may stand revived, and be in the same plight against the said *Bertram P. Cruger*, *Nicholas Cruger*, junior, *Ann Towers*, *Peggy Towers*, *Catharine Towers*, *Mary Towers*, *Catharine Cruger*, *Polly Cruger*, and *Sarah Cruger*, as the same was at and immediately before the marriage; or that the defendants show cause to the contrary: and in particular, that the said *William* and *Ann* may have the same right of electing the one third part of the real and personal estate devised to the said *Ann*, to be taken out of either the real or personal, as they may choose, and that their title thereto may be established. Process of *subpœna* to appear and answer was prayed against the defendants above named.

Bertram P. Cruger, Henry N. Cruger, and Nicholas Cruger, junior, put in their answer on the same 26th day of *March*, 1802, admitting the truth of the facts in the bill mentioned, and submitting themselves to the judgment of the court.

On the 13th day of *April*, 1802, an order was entered, stating that the bill of revivor and supplement had been filed in this cause, and Mr. *Harison*, of counsel for the complainants, suggesting to the court, that since the filing the original bill, *Betsey Towers*, one of the defendants, answered the same, after which she died, and that *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, are her only children and heirs, and that she had no executor, administrator, or other representative, except the said children; thereupon, on reading the affidavit of *Samuel M. Hopkins*, it was ordered that the said suit stand

revived against the said representatives of the said *Betsey Towers*, who have become interested by her death in the matters in question.

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

On the 14th day of *April*, 1802, *Isaac L. Kip* was again appointed guardian for *Catharine*, *Polly* and *Sarah Cruger*, infants, to appear and answer for them in that cause.

On the 5th of *August*, 1802, an answer was put in for these infants by their said guardian, admitting the bill; but they said, inasmuch as they are infants, incapable of binding themselves by their own act or assent, they submitted themselves to the court, whose peculiar province it is to protect the rights of infants, and they humbly hoped theirs would be protected. This answer was signed by the infants, and by their guardian and counsel. It was not sworn to by the guardian, nor by the infants, nor did there appear to be any order or consent that it should be received or filed without oath.

On the 28th of *February*, 1803, the defendants presented their petition, praying that the filing of the report of the appraisers be stayed till further order, that the same might not be inspected by the plaintiffs, or any person on their behalf, and that the plaintiffs should forthwith designate or elect from a schedule of the estate in their possession, their proportion of the said estate, subject to a final liquidation, according to the appraised value; and on the 7th day of *March*, 1803, an order was made, and the prayer of the said petition granted, so far as related to staying the filing of the said appraisement.

On the 17th day of *May*, 1803, the appellants filed a paper, subscribed by *Egbert Benson*, their counsel, and dated on that day, whereby they designated and elected the following parcels or articles, and in the following order: 1. The farm called *Rose-Hill*. 2. Lot on the opposite side of the road. 3. Pew in *Trinity Church*, No. 24. 4. Book debt against *Wm. Rogers*. 3. Book debt against

IN ERROR.
......
ALBANY,
March, 1808.
ROGERS and
Wife
v.
CRUGER and
others.

*Wm. H. Krause*, 32,716 dollars and 29 cents. 6. Book debt against *Quinton Dick & Co*. 7. Bond and mortgage against *John Cooke*. 8. The 8 *per cent*. stock of the *United States*. 9. The 3 *per cent*. stock. 10. The shares in the United Insurance Company, standing in the name of *Ann Rogers*. 11. The shares in the *United States* Bank. 12. The 6 *per cent*. navy stock. 13. Twenty of the shares in the Bank of *New-York*. 14. Twenty of the shares in the Bank of *Albany*. 15. Shares in the *Manhattan* Company.

The appraisement was dated the 7th of *March*, 1803, and filed about the 20th of *May*, 1803; and on the 28th of *May*, 1803, an order was entered, on the motion of the defendants' counsel, by consent of the counsel for the complainants, that the report of the appraisement, filed in the cause, and the paper filed, purporting to be the designation or election of the complainants, of the articles, as the one third part devised to the said *Ann*, be referred to a master; that each party be at liberty to except to all or any of the valuations in the said appraisement, touching which the master might examine witnesses; that the master should inquire into the whole amount of the aforesaid estate and report the same, together with the amount and particulars of the property elected by the complainants.

The whole estate, as valued in the seven schedules annexed to the report of the appraisers, was as follows:

| | D. | C. |
|---|---|---|
| Real estate, exclusive of such as was purchased by the testator after making his will, | 122,905 | 62 |
| Dower estate, | 71,713 | 00 |
| Stock, | 141,779 | 69 |
| Debts, (good,) | 307,563 | 9 |
| Furniture, | 852 | 75 |
| | 644,814 | 15 |

*IN ERROR.*
. . . . .
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

|                   | D. | C. |
|-------------------|----|----|
| Doubtful debts,     -  -  - | 80,092 | 86 |
| Bad debts,          -  -  - | 55,030 | 25 |

On the 21st of *May*, 1804, an order was entered in the court of chancery, in a cause entitled *William Rogers* and *Ann* his wife, against *Bertram P. Cruger*, *Henry N. Cruger*, *Nicholas Cruger*, *Henry Cruger* and *Mary* his wife, *William Bard* and *Catharine* his wife, *Sarah Cruger*, *Ann Towers*, *Margaret Towers*, *Catharine Towers*, and *Mary Towers*, wherein it was ordered by consent of parties, 1st. That the order of the 8th of *May* last, referring to a master the appraisement of the estate of *Nicholas Cruger*, deceased, be discharged, and that the writing purporting to be the election by the complainants of the several parcels, or articles, as the one third of the said estate devised to the complainant *Ann*, and the said appraisement be deemed to be confirmed, but to remain still in the hands of the master, subject to the farther order of the court. 2. That the complainants be deemed to have disclaimed all right to lands purchased after the date of the testator's will, except the dower of the said *Ann*. 3. That all controversies between the parties, relative to the testator's estate, be deemed to have ceased, except a claim made by the defendants, (except *Sarah*,) to be paid their proportions of a certain estate, or moneys mentioned in a writing executed at *St. Croix*, on the 27th of *August*, 1792, by *Henry Cooper*, as attorney for said testator, in relation to which the defendants may file a new bill, or amend their answers in this suit; and except further, all questions that may arise on taking the accounts of the complainants' administration, and that it be referred to a master to take such accounts, and the receipts and payments of the complainants, and of such payments to and receipts by the defendants as may be requisite to a final settlement and division, and that he may report specially from time to time; and that all questions of costs be reserved until the

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
*v.*
CRUGER and
others.

final decree. 4th. That there shall be forthwith a division in part of the estate of the said testator, between the complainants on the one part, and all the defendants on the other, and between the defendants themselves, as specified in the schedule annexed, this day filed, and that the stock and the sums therein mentioned to make up the balances of the several accounts due to each of the defendants, except the said *Sarah*, be immediately, on demand, transferred and paid to the said defendants, and that the securities be forthwith assigned and delivered to them. 5th. The said *Ann* to be deemed seised and vested in severalty, with the several parcels of real estate therein specified as her share, and that the defendants be deemed vested of the remainder, according to their interests therein; that such conveyances and releases be executed under the direction of a master, as may be requisite. Provided, that the said division is not to prejudice the defendants' claim upon the complainants, if any loss should be sustained by their neglect.

The valuation of the one *third* elected by the widow, was stated in the report to be as follows:

|  | D. | C. |
|---|---|---|
| *Rose-Hill* farm,  -  -  - | 50,000 | 00 |
| Lot opposite,  -  -  - | 2,500 | 00 |
| Pew in *Trinity Church*, | 375 | 00 |
| Eight *per cent.* stock, 12,600  - | 13,860 | 00 |
| Three *per cent.* 4,201,   - | 2,436 | 58 |
| Six *per cent.* navy stock, 500,  - | 500 | 00 |
| Shares in the United Insurance Company, | 13,250 | 00 |
| Three shares in the Bank of the *U. S.* | 1,752 | 00 |
| Six shares in the Bank of *New-York*, | 4,440 | 00 |
| Debts, to wit: *William Rogers,* | 44,246 | 96 |
|          *William H. Krause,* | 32,716 | 29 |
|          *Dickson & Stockholm,* | 1,098 | 93 |
| Balance to complainants,  - | 10,122 | 38 |
| Total, | 177,298 | 14 |

In consequence of the partial division, the heirs of the said *Nicholas Cruger* applied to the supreme court for partition of the lands therein given up to them, the said *Bertram P. Cruger*, being appointed guardian for the said *Towers*, and judgment of partition was given, and the lots and houses in *New-York*, were advertised for sale, in pursuance thereof, in the spring of the year 1805, and the parties proceeded on the said order for a division in some other particulars; and the said *William Rogers* completed the same on his part, except as to the stock of the *United Insurance Company*, which stood in the name of the said *Nicholas Cruger*, being twenty-five shares, which was to have been transferred according to the said order, but was not transferred; and the said *William Rogers* has received the dividends upon the same ever since, and the mortgage to the said company, on *Union Hall* estate, which, by the appraisement, was to have been paid out of it, has not been paid.

On the 15th of *June*, 1805, *Bertram Peter Cruger*, for himself, *Nicholas Cruger*, *Henry H. Cruger*, *William Bard* and *Catharine* his wife, *Henry Cruger* and *Mary* his wife; and *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, infants, by the said *Bertram P. Cruger*, their guardian and next friend, presented their petition to the court of chancery, setting forth the said original bill, and the answers thereto, the bill of revivor and the answers thereto; that the bill and the answers were drawn by the same solicitor, being an amicable suit; that three persons were appointed by an order, entered as by consent of the solicitors, to appraise the said estate, which commissioners made their report, the election of the said *Ann* to take her third, as before mentioned, in certain articles *subject to a final liquidation*, and that the said report had been referred to a master; that controversies arising, the solicitor, who had acted for the petitioners desired them to appoint another solicitor, as he thought it not proper to conduct the business for them

*IN ERROR.*

. . . . .

ALBANY,
March, 1808.

ROGERS and Wife
v.
CRUGER and others.

IN ERROR.
•••••
ALBANY,
March, 1808

ROGERS and
Wife
v.
CRUGER and
others.

farther than as the same was conducted by mutual consent, whereupon they appointed another solicitor, and their former solicitor was appointed solicitor for the complainants; that afterwards *William Bard* intermarried with *Catharine Cruger*, and *Henry Cruger*, jun. with *Mary Cruger;* that *Elizabeth Towers* had intermarried with *Alexander Maitland*, and had departed this life, leaving her said children her heirs; that the said bill was not revived against the said *Elizabeth Maitland* and her husband, nor were her children regularly made parties to the suit. They farther stated that soon after the said appraisement the petitioners applied to the said *William Rogers* for a division of at least the rents and profits of the said estate, giving each his portion thereof, which he refused; whereby some of them were put to inconvenience, and were obliged to borrow money to support their families for a considerable time. That in *May*, 1804, the petitioners, some of whom were then infants, and others lately come to age, were ignorant of the real value of the farm called *Rose-Hill*, and the lot adjoining, and the said *William Rogers* withholding from them two hundred thousand dollars and upwards, their proportion of their father's real and personal estate, and the annual income thereof, until they should consent to the proposed division, valuation, and election, they directed their counsel to consent thereto, and the order of the 21st day of *May*, before mentioned, was accordingly agreed to. That considerable sums still remained in the hands of the said *William Rogers* to be divided, and the delay in relation to the stock had occasioned to them a loss of from ten to twenty *per cent*. The petition further stated, that some months after the said rule, a sale of some lots of ground, about half a mile farther from the city of *New-York* than *Rose-Hill*, was made, at from three to four thousand dollars per acre; from which, and other sales thereabout they had discovered, and expected to be able to prove, that the said farm of ninety-two acres of land,

which is about one mile from the streets of *New-York*, fronts on the east river, and the post road, and is highly improved, would sell for upwards of two thousand dollars per acre, one with another. That they were ignorant what was the real value of the said farm, when the said rule was entered, and although they believed it was low, yet they had no idea or suspicion that the valuation was so grossly inadequate. That some of them being put to great inconvenience and mortification by being obliged to borrow money for the ordinary support of their families, and acting as they did under a misrepresentation, the said *William* took an undue advantage of their situation, by insisting on a confirmation of the said valuation, as a condition of giving them their own property, and the advantage thereof ought not to be retained by him. That they were much injured and aggrieved by the error in the valuation of the said two farms, and the said *William* and *Ann Rogers* taking the same at that valuation; and as an evidence of the said error, four of the petitioners offered to pay for it, subject to General and Mrs. *Gates's* lease for life, one hundred thousand dollars, payable in such short time as the court might direct, the money to be divided as the will requires ; or to admit the said *William* and *Ann* to retain them at a fair valuation. The petition prayed that the said order of the 21st *May*, 1804, might be set aside, (the petitioners offering to relinquish all orders made since that time, if the plaintiff required it,) for the following reasons :

IN ERROR.
ALBANY,
March, 1808.
ROGERS and
Wife
v.
CRUGER and
others.

1. Because *Mary Cruger* was an infant at the time when the said order was entered.

2. That four of the persons named in the title of the cause in the said order were not parties in the suit, and were not bound by those proceedings.

3. That *William Bard* and *Henry Cruger* were not parties to the suit, and it had abated against their wives by their intermarriage ; and therefore they were not bound by what was done.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

4. That the appraised value of the said two farms was less than one half their real value, and the order for confirming the same was agreed to, from ignorance and misapprehension of its real value, and from an anxiety to get possession of what was not disputed, the withholding of which until a final division could be made, was taking an undue advantage of the situation of the petitioners, unjust in itself, and contrary to the express direction of the will of their father:

5. That Mrs. *Towers*, afterwards Mrs. *Maitland*, never was a party to the said suit, nor were her heirs parties thereto.

*Bertram P. Cruger, Nicholas Cruger, William Bard*, and *Henry N. Cruger*, verified the facts set forth in the said petition, in substance, by their affidavits, and further deposed that they had no idea, that the said two farms had been valued at a sum so greatly short of the real value, until several pieces of ground were sold at auction at *Kip's* bay, shortly after the said rule was entered, for from three to four thousand dollars per acre. That *Kip's* bay is about half a mile farther from *New-York* than *Rose-Hill*, and the latter, at least, not much inferior in value to the other, except the encumbrances for the life of General and Mrs. *Gates*. That they believed it was then worth more than one hundred thousand dollars, and they offered to give that sum for it, subject to the encumbrance. They also deposed that they received from the said complainants, no money or property from about the month of *October*, 1802, until *June*, 1804. That applications for money were made within that period, and the same were refused; and that the stock was considerably lessened in value before it was received by the petitioners.

The chancellor ordered copies of the petition, and affidavits to be served on the complainants, that the merits of the petition should be heard at the then next term; and that an injunction should issue to stay the sale of the houses and lots, under the judgment for partition, until

farther order: of all which the complainants were served with due notice.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v
CRUGER and
others.

Upon the hearing, the respondents exhibited to the court a correspondence by letters, between *Bertram P. Cruger*, on behalf of the heirs, and the said *William Rogers*, in *June* and *July*, 1803, which it is not deemed necessary here to state.

The petition was argued in *May*, 1806, and in *September*, following, the chancellor pronounced an opinion in favour of the petitioners; but, on the application of the complainants' counsel, ordered another argument.

In *March*, 1807, the respondents, being the petitioners before mentioned, exhibited a farther petition to the court, stating their former petition, and the orders made thereupon, and stating farther that they had since discovered that a paper purporting to be the answer of *Elizabeth Towers*, and subscribed " *John Nixen & Co.* attorneys for Mrs. *Towers*," to *Ann Cruger's* bill, was filed on the 17th day of *May*, 1801, in the clerk's office, when no such bill was filed; the said bill not being filed until the 18th of *May*, 1801; that Mrs. *Towers*, about the 1st of *May*, 1801, previous to the filing the said bill, was married to *Alexander Maitland*, and consequently could not appear to, nor answer, nor be made a party to any suit against her, by the name of *Towers*. That the said *Alexander Maitland* and *Elizabeth* his wife, made a joint will, according to the laws of *St. Croix*, where they then resided. That the said *Alexander Maitland* departed this life in the month of *September*, 1801, and the said *Elizabeth* departed this life soon afterwards, having first made and published her last will and testament, and therein appointed *William M'Cormick*, *Francis Claxton*, and *William Mitchell*, executors thereof, and also guardians of the petitioners, *Ann*, *Peggy*, *Catharine* and *Mary Towers*, her children. And the petition further stated that inasmuch as neither said *Elizabeth Maitland*, nor her husband, nor their representatives have ever been

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

made parties in this suit, as they have both made testamentary dispositions of their estate, the particulars of which are unknown to the petitioners, and inasmuch as no order or decree can bind them or the parties and settle their rights, the petitioners pray that the paper purporting to be the answer of *Elizabeth Towers*, be taken off the files of the court, and that all proceedings in the cause subsequent to the filing the original bill of *Ann Cruger* be set aside, and all orders therein be vacated, or that such other order be made thereupon, as may be proper and agreeable to the practice of the court of chancery.

With the said petition was exhibited the affidavit of *William M'Cormick*, of the island of *St. Croix*, who made oath that *Alexander Maitland* and *Elizabeth Towers* were married some time between the twenty-eighth day of *April* and the fourth day of *May*, 1801 ; that the said *Alexander* died in *September*, and the said *Elizabeth* in *October*, following, in the same year; that the said *Alexander* and *Elizabeth* made a joint will; that the said *Elizabeth* also made a will, and appointed him, the deponent, *Francis Claxton* and *William Mitchell*, of *St. Croix*, executors thereof, and guardians of her children, in which capacities they have acted.

A copy of the said petition and affidavit was served on the appellants, on the 26th *March*, 1807, with notice that the same would be presented, when the farther argument of the former petition should come on, and that the same would be supported and insisted upon, as well from the former affidavits as that of the said *William M'Cormick*.

In the *May* term of 1807, the two petitions aforesaid were heard by the chancellor, and the appellants exhibited various affidavits and letters, which were read; but which it is not necessary here to insert.

*Nicholas Low, Abijah Hammond,* and *John Lawrence,* deposed that they did not disclose to the complainants, or any other person, prior to the return of the ap-

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

praisement, the value affixed to the estate of *Nicholas Cruger*, deceased, by the appraisers, except to each other.

*Thomas Cooper* proved a sale of some land three miles and three quarters from the *City-Hall* of *New-York*, at auction, for cash, on the 15th of *August*, 1803, formerly belonging to *Thomas B. Bridgen;* it was surveyed into different lots, and sold at different prices, from 800 to 300 dollars per acre.

*John Titus* deposed that in *June*, or *July*, 1802, he treated with Mr. *Kip* for four or five acres of the farm, called *Kip's Bay*, adjoining the post road in front of *John Murray's* land, now called *Inclenberg*. He offered 350*l.* per acre, and *Kip* asked four hundred pounds per acre.

*Philip Hone* deposed that on the 16th of *May*, 1804, he sold at auction in *New-York*, for the proprietors of the farm at *Kip's Bay*, ten lots adjoining each other, at a place called *Inclenberg*, bounded in front on the post road, and in the rear by a street sixty feet wide, distant about six hundred yards from *Rose-Hill* farm; each lot fifty feet front, and four hundred in length. The whole sold for 10,870 dollars.

*William Bayard*, *Charles Wilkes*, and *Thomas Cooper*, having been appointed by the court of chancery general guardians of *Ann*, *Margaret*, *Catharine*, and *Mary Towers*, they presented a petition, at the hearing of the argument on those petitions, in the names of these infants, giving a statement of the proceedings, tending to support them ; that the application by the said *Bertram P. Cruger*, on behalf of the said infants, was an unauthorized act of the said *Bertram P. Cruger*, and of his solicitors or counsellors, without the knowledge or consent of those infants, or of any person authorized to assent or act for them. The said petition further stated, " that the petitioners are advised and firmly persuaded, that it would be greatly against the interest of the petitioners, to have the said proceedings in the said suit, or

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

the said order set aside, by reason of any want of form, which may have been in the proceedings in the court. But so far as it may appear to the court, that the said estate or farm called *Rose-Hill*, or the said four and three-quarters acres opposite thereto have been appraised under their value, the petitioners conceived it would be to their interest to have a new estimation or appraisement thereof; the petitioners offered to file an answer to the said original bill, and bill of revivor, *nunc pro tunc*, and therein and thereby to admit all the material facts set forth in the said original bill and bill of revivor, in order that all the proceedings which had been had thereon in this honourable court might be confirmed, except the valuation and appraisement of the said two estates at *Rose-Hill*, which the petitioners, however, cannot say any thing about, nor whether the same was too low or not." The petition then prayed that all the said proceedings might be confirmed, unless it should appear that *Rose-Hill*, and the adjacent lands had been *unduly valued*, and then they prayed such relief, as to the said appraisement, as to the court might seem proper.

The two petitions having been fully argued, (the first a second time,) his honour the chancellor, on the 18th of *September*, 1807, delivered his opinion upon the merits of them, and made the following order. " That all proceedings whatsoever, purporting to have been against *Elizabeth Towers*, the mother of *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, who are infants, and also against the said infants be, and the same are, hereby set aside for irregularity. And it is farther ordered, that all proceedings in this case against the other defendants subsequent to the putting in of their answers to the bill of revivor, be set aside by reason of irregularities in the said proceedings, and that the question of costs be reserved." From which order the present appeal was made.

The reasons for this order were thus assigned by

Rogers and
Wife
v.
Cruger and
others.

The CHANCELLOR. The defendants presented their petition, praying for a *hearing*, upon the merits of an order made in this cause on the 21st day of *May*, 1804.

After having been fully heard on its subject matter, and having in the preliminary discussion travelled with great minuteness through the merits, and after an opinion was expressed thereon, it was discovered, that either the court or the parties had laboured under some misapprehension on the occasion, as to the precise object of the argument, and the order of the court was, in consequence of it, so modified as to limit it to a hearing, leaving the merits generally open.

In a cause involving a question on property of such great extent in value as the present, I could certainly have had no repugnance to receive every elucidation which the subject was susceptible of. And my intimation on the occasion was merely to repel the force of the precedent it might be otherwise deemed to make. It has not been usual so to conduct applications for a rehearing. This was less formal, as arising on a decretal order only, and not on a final decree, and could not have been yielded to, but under special circumstances, or from a suggestion of misapprehension.

The defendants, upon the second argument, had, as in the first, relied upon the points stated in their petition, which were,

1. That *Mary Cruger*, in whose right her husband the defendant, *Henry Cruger*, claimed, was an infant at the time of making the said order.

2. That four of the persons named in the title of the said cause, were not parties thereto, and in no way bound by what was so done.

3. That *William Bard* and *Henry Cruger*, named in the title of the said order, were not and are not parties to the said suit, and that the suit had abated, by their in-

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

termarriage, against their wives, and was not revived, which is irregular, and the order not binding on them.

4. That the appraised value of the said two farms is less than one half of their real value, and that the order for confirming the same was agreed to from an ignorance and misapprehension of their real value, and from an anxiety to get possession of what was not disputed, the withholding of which until a final decision could be made, was taking an undue advantage of the situation of the petitioners.

5. That Mrs. *Towers*, afterwards Mrs. *Maitland*, never was a party to the said suit, nor were her heirs regularly parties to the suit, nor are they bound by any proceedings therein.

This suit, in its origin, was an amicable one. All the proceedings, until it assumed an adverse complexion, were entered by consent, without the actual interposition of the court, and the whole were moulded, by the joint concurrence and joint efforts of the parties, to the form in which they appeared on the minutes.

It was therefore important, *in limine*, to ascertain how far the parties assenting were legally competent to give an assent binding upon them, and whether such assent was to be inferred from their acts.

This required a succinct view of that part of the pleadings relating to them.

[Here the chancellor stated the proceedings which had taken place in the cause.]

There were further proceedings, which had no bearing on any other than the fourth point, and which having no necessary connection with the others, its consideration, and the facts connected with that point, were postponed, until it should be discovered, from a disposition of the other points, whether it would be necessary to examine them.

As to the first point, that *Mary Cruger* was an infant at the time of making the order:

It appeared, from the admission of the parties, that *Mary Cruger* was born the 24th day of *September*, 1782. On the 21st of *May*, 1803, the order for confirmation of the master's report was entered, and on the 28th of the same month an order of reference was made, which was discharged by the order of the 21st day of *May*, 1804. The defendant *Mary* came of age on the 23d day of *September*, 1803. Of consequence all the orders prior to that of the 31st of *May*, 1804, were made during her nonage.

*IN ERROR.*

ALBANY, March, 1808.

ROGERS and Wife
v.
CRUGER and others.

The court of chancery gives extrajudicial directions to protect the interests of infants, which are peculiarly the objects of its care and attention.* It will hear a person on the subject of their interests, as *amicus curiæ*. It will not usually make a decree by consent, where infants are concerned, without referring it to a master to inquire whether it is for their benefit.† It holds that he can admit nothing; and I was of opinion, from the scope of authorities, from the course of the practice, and from the duty imposed on the guardian to avail himself of the best defence the nature of the case will admit of, that the guardian must answer under oath. The complainant may, with the leave of the court, dispense with the oath: but as the forms of the court, and the interest of the infant, require it, I was inclined to think it could not be deemed an answer, so far as respects the infant, without the usual solemnity of an oath, or its legal equivalent, an affirmation; for if it is not sworn to, it has been held that it ought to be quashed.‡

* 2 *Vesey*, 484.

† 1 *Bro. C. C.* 488. 2 *Atk.* 377.

‡ 1 *Hind. Pr.* 205. *Prac. Reg.* 183.

To infants no *laches* is imputable, and they may, therefore, in any stage of their nonage, avail themselves, in many instances, of matters on which adults would be concluded. But here the defendant *Mary* was a *feme covert*. She had an adult husband, and this situation is so far respected in the court of chancery, that if a guardian had not been appointed before the coverture, none would have been appointed afterwards. Her husband

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

had waived every informality which can affect him, and the order complained of was entered, by consent, after she came of age. This was an affirmance of all the preceding acts, and she could not be permitted to avoid an act formally and deliberately done by her counsel, without showing that it was done against her consent, which was not pretended.

The second objection was, that four of the defendants named in the cause were not parties thereto. With this the fifth objection, that neither *Betsey Towers* nor her heirs ever were parties, was so connected, as rendered it proper to consider those objections together.

The answer of *Betsey Towers* was put in for her, by *John Nixon & Co.*, by virtue of the letter of attorney to *John Nixon* and *David Walker*, jointly. It did not appear that they, either of themselves, or with others, constituted a copartnership under that firm. If that had been the case, it is by no means a necessary consequence, even in the former case, that the power given to them jointly must attach to the firm under which they were described for commercial purposes; but if it did not comprehend others—if the execution is to be strictly tested by the power, it was incompetent, in its terms, to authorize the putting in an answer, in the manner in which this has been put in, and on this ground it resolved itself into a question of substance; for the intent of the principal, as to be collected from the letter of attorney, was to avail herself of the joint care and attention of both her attorneys; to repose upon the united exercise of their judgment, as well as upon the responsibility of each. But the admission of the firm would so far defeat that intent, as to enable either of them to execute the power, without the agency of the other, or even a stranger to the power, as one of the firm might be, could in that case have executed it.

Besides, the establishment of a firm is merely commercial. It is derived to us from the law of merchants,

and relates only to matters connected with that law; but
it cannot extend to proceedings having no connection
with commerce. Here the act performed had no con-
nection, either immediately or remotely, with trade. It
therefore appeared to me, that the legal intendment was
clear, that it was confined to the attorneys named, joint-
ly, and that by them jointly the answer must have been
put in to bind their principal, if under the power she
could by them have been bound at all by their answer.
It cannot be collected from the answer, that the attor-
neys united in putting it in.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

Another objection was taken from the terms in which
the letter of attorney was conceived. The general power
contained in it, is to act in the management of the pro-
portion of *Betsey Towers*, of the estate of her deceased
father *Nicholas Cruger*, agreeably to his will, as they
shall see needful and necessary; and also for her and in
her name, to ask, demand, sue for, &c. These terms do
not embrace the power of binding the principal by an
answer. They are only calculated to empower the attor-
neys to manage the ordinary business of the estate.

I have not been able to discover any legal principle,
which will establish that a general power of this kind
will warrant the putting in an answer. The settled prac-
tice of the court is decidedly at variance with it; for if a
defendant is at a place which renders it inconvenient for
him to appear before a master, a *dedimus potestatem* is
issued to take his answer, and if it is necessary, even
after consent, to obtain the leave of the court to dispense
with an oath, it would seem to require prerequisites, at
least as formal and efficient, to subject the interests of a
defendant to a decision of the court, without the personal
answer of the defendant, in a case in which the answer
is the avowed basis of proceeding.

In an anonymous case in *Peere Williams's Reports*,
(1 *P. Wms.* 523.) it was said, if there had been a general
letter of attorney to appear and defend suits, the court

*IN ERROR.*

ALBANY,
March, 1808.

Rogers and
Wife
v.
Cruger and
others.

* 1 *Hind. Pr.* 20.
2 *Atk.* 290.

† 10 *Ves.* 31.

would have ordered the attorney to appear for the principal; but it was there held that an answer without oath was nothing, and the motion was denied.

Before the 27th of *April*, 1748, it was, it seems, not unusual, in the *English* court of chancery, to take answers before the masters, or commissioners, without the defendant's subscribing them, though the signature of counsel was then requisite, and the answers were taken from the defendants personally.* By a rule then entered, the signature was superadded; but there is no intimation in any of the books that previous to that period the personal answer of the defendant could be dispensed with.

At the time of filing the bill in this case, *Betsey Towers* was the wife of *Alexander Maitland*, for the bill was filed the 18th day of *May*, 1801, and they married about the beginning of that month.

The bill filed against her as a *feme sole* could not bind her interest as a *feme covert*, or that of her husband, unless they had estopped themselves by some act in court. There was, however, no other act attributed to them by the complainants, than the filing their answer by *John Nixon & Co.*, and the proceedings founded thereon, which I have already given my reasons for concluding that it ought not to affect them.

From these views of the subject, I was of opinion, that *Betsey Towers* never was a party to the suit; that the answer filed for her was irregularly obtruded on the files, and could not be considered as her answer.

In tracing the proceedings for reviving the suit, it appeared to me proper to consider the influence of this state of things on it.

The complainants having intermarried on the 17th day of *November*, 1801, a bill of revivor was filed in consequence thereof, on the 26th day of *March*, 1802, the original bill having become abated by such intermarriage.†

The bill of revivor states the death of *Betsey Towers*,

and that the defendants, *Ann Towers*, *Peggy Towers*, *Catharine Towers* and *Mary Towers*, were her children and heirs. To this bill their answer was filed by *Isaac L. Kip*, their guardian, who was appointed such on the 14th day of *April*, in the same year. On the day preceding which an order was entered to revive the suit against them, on a suggestion of the death of *Betsey Towers* This being before the appointment of a guardian, the order for the revival appears to have been entered against the infants, in a suit actually abated by the intermarriage of the complainants, before they had been brought in by process, and before they could possibly be legally apprized that they were required to appoint a guardian, whom, though infants, they might have been of competent age to nominate, and thus disregarding the event which had so absolutely and totally abated the suit, as to require a bill of revivor to resuscitate it, and providing for an object comparatively less influential on the fate of the suit, the succession of the defendants to the rights of their mother, which might, if the absolute abatement, arising from the intermarriage of the complainant, had not accompanied it, have been pursued without a formal revival. But under the existing circumstances, the order for the revival, as against the heirs of *Betsey Towers*, had no suit to which it could attach, the defendants not having been brought in by *subpœna* on the bill of revivor, and no person having, in that stage of it, appeared for them.

The order of the 24th day of *August*, 1802, was said to have been grounded on that of the 13th day of *April* preceding; though it was described as of the 14th, and *as that*, by which the suit stood revived. It was expressly granted, on proof of the service of the latter on *Thomas Smith*, the clerk in court of the defendants, and upon reading and filing his certificate, that the defendants have not put in their answer, nor signified their disclaimer of the matters in controversy in the terms prescribed by the 6th sect. of the act of the 3d of *April*,

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
••••
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

*Sess. 24. c. 133.

1801,* and thereupon orders that the complainants may cause the appearance of *Ann Towers, Peggy Towers, Catharine Towers,* and *Mary Towers,* to be entered ; and that the answer of *Betsey Towers* be taken as and for their answer; thus assuming Mr. *Smith,* as representing them in court, though by the abatement of the original suit, by the coverture of the complainant, *Ann,* the connection between it and him had been completely dissolved ; and founding the order, for an appearance, and the abiding by the answer, merely on the service of the order, that the suit be revived on suggestion of the death of Mrs. *Towers.*

This would have been proper on the death of Mrs. *Towers only,* if her answer had been regularly put in, and no other contingency to interrupt the progress of, or abate the suit, had occurred; but in the present case, the combination of two events, one operating as an absolute abatement of the suit, and, if standing alone, compelling the complainants to file a bill of revivor, the other a qualified abatement, arising from a mere succession to rights, by the act of God, had been acted upon, as if the double contingency exempted the complainants from resorting to a bill of revivor, and exacting a new answer.

This again, in my opinion, concluded against the complainants, and appeared to be unwarranted by the established practice of this court; and I was clearly of opinion, that the defendants, *Ann Towers, Peggy Towers, Catharine Towers,* and *Mary Towers,* were never parties to the suit.

The question respecting the filing the answers previous to the bill, I was rather inclined to think was to be determined on the point, that it was a *clerical* mistake. The parties had united in carrying on an amicable suit, their measures were taken in concert, and the probability is, that the bill and answer were concurrent acts. At all

events, if it was a mistake, I thought it ought to be corrected, or overlooked.

IN ERROR.
......
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

This cause was conducted to a certain stage, by the mutual coöperation of all the parties in interest, evidently by consent; and I well recollect, after I came into the court of chancery, that the orders which were taken were always preceded by those kind of suggestions usual in amicable suits; and as the mode of introducing the parties into the suit never came in one collected view, the acts of the court were always founded on the state of the proceedings, at the point at which its powers were required to be exerted, without any retrospect to their origin or progress, beyond the precise stage which was necessary to be disclosed, to show the propriety of the order. Hence, though there is a long detail of the proceedings of the court, the whole were modelled by the counsel, so as to adapt them to the views of the parties, until the collision of their interests interrupted the harmony which had subsisted between them; and even after that period, the order for a reference to a master was discharged by their joint consent.

It was, however, essential in this case, to bind the interest of the parties, who were infants, that the reference should have been acted upon, as the discharge of the reference was merely by consent, and without an appeal to the court for the exercise of its discretion on the occasion.

The intent of the testator was to have his estate equally divided into three parts, and to vest in his widow a right of electing which portions of his property she would take to the amount of one third in value.

If at any time before the election was perfected, and the subsequent proceedings consummated, a palpable disproportion should be so manifest as evidently to create a great and inequitable disparity, I had little doubt but that it would have been proper to equalize it, as otherwise, the benefits intended to be given to the de-

IN ERROR.
•••••
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

visees would, in their relative proportions, be deranged, and the intent of the testator defeated.

In this case, circumstances were disclosed, which rendered the correctness of the appraisement questionable. Though a considerable share of discernment was acknowledged to be possessed by the appraisers, and not a doubt was entertained of their integrity; the probability was, that a rapid rise in value of the estate of *Rose-Hill*, had contributed to its incorrectness.

If the parties had been in a situation to make it an object of inquiry, the expediency of referring it for that purpose might have been a question; it could be none at the time of my decision.

The letting the cause stand over to enable the complainants to bring in parties, might have been a proper order, in other circumstances of the cause. As it then stood, I was to decide whether the order of the 21st of *May*, 1804, ought to be supported. I was of opinion it could not. It was not binding on the defendants, *Ann*, *Peggy*, *Mary*, and *Catharine Towers*. If it was not on them, the interests of all the parties were so intimately united, that the reciprocity of those interests seemed to require that they should be supported, so far as respected the present suit, or that they should fall together.

The defendants, *Ann*, *Peggy*, *Mary*, and *Catharine Towers*, by *William Bayard*, *Thomas Cooper*, and *Charles Wilkes*, who were appointed by this court their guardians, on the 17th day of *February*, 1806, proffered their assent to all the proceedings; unless it should appear that *Rose-Hill*, and the 4 3-4 acres opposite thereto, were undervalued, in which case they conceived it for the interest of the infants to have it reappraised. No other of the parties joined in this proposition; but it was a conditional one, and if available, it must be by the assent of the other parties. It could, therefore, have no influence on my decision; for if the proceedings could not bind the defendants, whose guardians made

the offer, without their affirmance, it was a valid reason for the other defendants to resist the progress of proceedings, which, while it might embarrass, could not contribute to settle, their interests definitively.

Upon the whole, under whatever aspect the business was viewed, it concluded, very forcibly, in my opinion, to the avoidance of the order in question. It was made under circumstances which would not warrant it, and it ought to be vacated. Such being my opinion, it became unnecessary to pursue the investigation of the subject matters of the 3d and 4th points, which were made in the cause.

*IN ERROR.*
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

I reserved the question of *costs* for further consideration, if they should be claimed.

A petition of the defendants by their counsel, presented in *May* term, extended the application to the avoiding all the proceedings subsequent to the filing of the bill, as to the defendants, *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, and the proceedings subsequent to the answers of the other defendants, after the filing their answers. For the reasons already given, I was of opinion that the order might be enlarged so as to embrace those objects. And I accordingly directed such an order to be entered.

The cause was then argued by *Benson* and *Harison*, for the appellants; and *Pendleton* and *T. A. Emmett*, for the respondents. The argument lasted *eight* days, and the counsel on both sides displayed great learning, ingenuity and eloquence; but the facts discussed and authorities cited, are so fully examined in the opinions delivered by the members of the court, that it is not requisite to state the arguments of counsel, further than to present the points of law raised, and the cases cited.

For the *appellants*, the following cases were cited;
1. As to the alleged irregularities in the proceedings in

*IN ERROR.*
*.....*
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

the court below; 3 *Atk.* 439, 440. 6 *Ves.* jun. 285. 10 *Ves.* jun. 441. 1 *Vern.* 400. 3 *P. Wms.* 195. 2 *Eq. Cas. Abr.* 419. *Mitf. Plead.* 57. 71, 72. 1 *Dickens*, 8. 1 *Vern.* 487. *Prec. in Ch.* 83. 1 *Atk.* 73. 1 *Vern.* 140. *Bunb.* 200. 2 *Atk.* 510. 1 *Ves.* jun. 417. 2 *Atk.* 15. 3 *Atk.* 110, 111. 4 *Bro. Ch. Ca.* 122. (old edit.) 6 *Bro. P. C.* 129. 1 *Dick.* 31. 4 *Vin. Abr.* 147. s. 2. 2 *Eq. Cas. Abr.* 1. 1 *Ves.* 182. *Mitf.* 55, 56. 1 *Har. Ch. Pr.* 128. *Str.* 708. 2 *Eq. Cas. Abr.* 238. s. 18. *Mitf.* 26. 1 *Ch. Rep.* 252. 1 *Har. Ch. Pr.* 289. 1 *Dick.* 22. 1 *Bro. Ch. Cas.* 484. 1 *Dick.* 28. *Select Cas. in Ch.* 129.

2. That the trust devolved on the court of chancery, 1 *Bro. C. C.* 81. *Saunders on Uses*, 116. 2 *Fonb.* 173. *in note.* 3 *Ves.* 87.

3. As to the right of election by *Ann Rogers;* 9 *Vin. Abr.* 358. s. 5. *Elect.* A. 2. *Hob.* 174.

4. That no change in the value of the property subsequent to the election ought to be regarded; but that the valuation ought to stand; 2 *Powell on Contracts*, 61. 79. 2 *Vern.* 280. 1 *P. Wms.* 61. 2 *P. Wms.* 410. 1 *Bro. Ch. Cas.* 156. 2 *Bro. Ch. Cas.* 17. 1 *Fonbl.* 132.

On the part of the *respondents*, the following cases were cited; 1. As to the irregularities in the proceedings in the court below. *Mitf.* 144. 3 *Bro. Ch. Cas.* 365. 1 *Bro. Ch. Cas.* 229. 2 *Atk.* 290. 3 *Bro. Ch. Cas.* 25. 7 *Ves.* jun. 11. 11 *Ves.* jun. 306. 2 *Bro. Ch.* 127. 1 *Atk.* 291. 3 *Bro. Ch. Cas.* 392. 400. *Finch*, 258. *Wyatt's Pr. Reg.* 13. 223. 212. 226. 1 *Vern.* 31. 1 *Dick.* 92. 1 *Har. Ch. Pr.* 225. 2 *Har. Ch. Pr.* 133, 134. 2 *P. Wms.* 387. 2 *Atk.* 377. 2 *Freeman*, 127. 2 *Vern.* 342. 224. 2 *Atk.* 520. 529. 1 *Ld. Raym.* 600. 2 *P. Wms.* 401. *Mosely*, 68. 3 *Bro. Ch.* 340. 1 *P. Wms.* 737. in *n.* 2 *P. Wms.* 119. 9 *Ves.* jun. 59. 2 *Vern.* 392. 429. 1 *Atk.* 420. *Ambl.* 197. 2 *Ves.* 206. 2 *Atk.* 529. 1 *Vern.* 31. 1 *Har. Ch. Pr.* 721. 2 *Ves.* 23. 1 *Ves.* 469. 1 *Atk.* 570. 2 *Har. Ch. Pr.* 232. *Gilb. Eq. Rep.* 230. 3 *Atk.* 603. 11 *Ves.* jun. 152. 163.

1 *Dick.* 310. 1 *Ves.* 313. 2 *Ves.* 484. *Prec. in Ch.*
543. *Hinde,* 228. 240, 241. *Parker,* 61. 2 *Atk.* 290.
6 *Ves.* jun. 171. 185. 10 *Ves.* jun. 441. 12 *Ves.* jun.
159.

2. As to the performance of the trusts. 7 *Bro. Ch.
Cas.* 318. 2 *Atk.* 58. 8 *Ves.* jun. 337. 2 *Ves.* 125. 2
*Str.* 915.

3. As to inadequacy of the valuation, and its effect, as
evidence of an undue advantage taken. 2 *Bro. P. Cas.*
16. 1 *Bro. Ch. Cas.* 287. 4 *Bro. Ch. Cas.* 198. 3 *P.
Wms.* 315. 1 *Vern.* 32. *Fonbl.* 209. 9 *Ves.* jun. 246.
12 *Ves.* jun. 373.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

YATES, J. The following questions arise in this case; 1.
Whether the infants were properly before the court of
chancery so as to be bound by the decretal order of the
21st *May,* 1804, confirming the appraisement; 2. If
they were properly before the court, whether the setting
aside that order, as to all the respondents, was fit and
proper on the ground of *mistake in the appraisers; sur-
prise on the respondents; or imposition or fraud of the
complainants.* I shall not, on the first question, take up
all the proceedings, and examine the merits of every ob-
jection in detail. This would be an unnecessary task; ma-
ny of them, being mere matter of form, were cured by sub-
sequent acts, and others not noticed in season, were waiv-
ed; but shall content myself in selecting such as appear of
sufficient weight to have influenced the chancellor in
granting the order, as to the infants, from which the party
has appealed.

From the manner in which this cause was first com-
menced, it appears that the rules of the court of chancery
have not been strictly adhered to by either party; but
the interest of infants being implicated, it required the
proceedings to be conducted with the greatest care and
vigilance, to secure the effect of the application to the
court, and in every step connected with their rights, to
have committed them exclusively to the direction of the

IN ERROR.
·····
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

chancellor, whose duty it is to protect those rights in every stage of the cause.

On an examination of the letter of attorney of *Elizabeth Towers* to *John Nixon* and *David Walker*, it does not appear that they were authorized to answer in chancery; it is confined to the management of her proportion of her father's estate; and if even it had contained sufficient power for the purpose, the joint signature of *John Nixon & Co.* is improper, and the answer could derive no legal authenticity from it; but the signature of Mr. *Hopkins*, as solicitor, (she residing in foreign parts,) might legalize the answer in the view of the court, if, at that time, the letter of attorney had not been virtually revoked by her intermarriage with *Alexander Maitland.* She could not be called upon to answer by a wrong name, or be made a party without her husband, who became entitled to her proportion of the personal estate by the marriage; those parties, consequently, never were in court, and I cannot discover in what manner the suit could have been revived against her infant children; yet this was done, and the order entered for that purpose is founded on a suggestion, that *Betsey Towers*, one of the defendants, answered the bill, after which she died, and that *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, were her only children and heirs, and that she had no executor or administrator, or other representative, except the said children, when in truth Mrs. *Maitland*, named in the order *Betsey Towers*, had left *Francis Claxton*, *William Mitchell* and *William M'Cormick*, her executors and the guardians of her children; and though they were not made parties, still, as executors, they retain their remedy for the personal estate left by her. The doctrine contended for, on the ground of want of information of their marriage, and subsequent death of Mrs. *Towers*, cannot, in this instance, be countenanced. It may with propriety be applied to acts of colonial governments done in the name, and after the death of the sove-

reign, previous to information of his death; for as those are
acts in the preservation of which the community are inter-
ested, sound policy requires that rights thus obtained should
be left in the undisturbed possession of the claimants. This
appears to me to be the ground of the decision at the cir-
cuit, in the ejectment cause in *Ulster* county, cited by the
appellants' counsel, when a patent thus granted, after the
death of King *William*, was produced as evidence of title;
but I think the impropriety is evident of extending that
rule, under the circumstances already mentioned, to the
infant children of Mrs. *Maitland.*

IN ERROR.

ALB
March

ROGE    and
W

v.

CRUGER and
others.

It is an unquestionable rule that infants cannot bind
themselves by their own acts, or by consent, even by
guardians, unless it be rendered manifest to the chancellor
that they would be benefited by it. Several of the other
respondents were infants when the proceedings, in many
instances, were by consent. The investigation of those,
however, may become unnecessary, from the result of
the discussion of the second question proposed, which
I shall therefore proceed to examine.

Whether the setting aside of the order of the 21st
of *May*, 1804, was fit and proper as to all the respond-
ents on the ground of *mistake in the appraisers; surprise
in the respondents;* or *imposition or fraud of the com-
plainants.*

It is alleged that the appraisement of *Rose-Hill* farm,
containing ninety-two acres of land, subject to a lease
during the lives of Mr. and Mrs. *Gates*, at 50,000 dol-
lars, and the land opposite, at 2,500 dollars, is inadequate
to the real value.

The persons appointed appraisers of this property
stand before this court unimpeached. The charge of
imposition or fraud cannot be attributed to them.
If the amount is inadequate, they have been mis-
taken in the value, and it must be deemed an error
in judgment, to which a rigid adherence to theoreti-
cal calculations, as to the value of encumbrances, with-

NY,
1808.
Ro͏͏͏ͦ͏s and
ͬife
v.
Cruger and
others.

out due regard to the advantages of situation, has, per-
haps, in no small degree contributed.

From the testimony before us, it appears that the
highest unencumbered value of *Rose Hill* farm, agreea-
bly to the calculations made on the principles supposed
to have been adopted by the appraisers, was about 91,000
dollars, making a difference of upwards of 4-9ths for the
two lives, the one aged 63, and the other 75, with
which it was encumbered; far exceeding any amount
I can possibly conceive the real existing difference to be.
This system of calculation will unquestionably, I think,
admit of an age in human life to which an estate may be
subjected, nearly, if not equal in value, to the fee-sim-
ple, which would render the reversion not worth any
thing, a position wholly inadmissible, and at war with
common sense. It cannot reasonably be imagined that
the incumbents would have charged 41,000 dollars to ex-
tinguish their interest in the premises : I am persuaded
it would be nearer the true value to estimate it at half
that amount. In that case, the unencumbered valuation
would be 70,000 dollars, instead of 50,000 dollars; and
yet this is a sum, from the testimony before us, certainly
below its real value ; but, independently of the offer made
by the respondents of 100,000 dollars, compare it with
the average of nearly all the sales in evidence, and it
falls short a considerable sum; but take those made by
*John Hone*, about 600 yards farther from the city, on the
same road, at a price exceeding an average of 2,000 dollars
*per* acre, and it will be found, after a reasonable deduc-
tion for the encumbrance, to be grossly inadequate, and
that too at a period of a few days previous to the date
of the order of the 21st of *May*, 1804, and at a time
when the appointment was subject to the rule of refer-
ence to a master, a circumstance tending to show the si-
tuation of the respondents, although doubtful, yet ig-
norant of the real value of this estate, and at that time
reluctantly assenting to the appraisement, under a mis-

IN ERROR.
•••••
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

taken supposition that the valuation, although low, was more correct than it really appears to be. And I cannot resist the impression on my mind that they were, in some measure, influenced by the peculiar situation in which they were placed, after the refusal of the appellants to relieve the necessities of some of them, as appears by the testimony of *James Palmer*, jun. or make a partial division of the estate, without their consent to the *will*, the *appointment*, and Mrs. *Rogers's choice*, as stated in the correspondence of *Bertram P. Cruger*, one of the respondents, and the appellant, *William Rogers*. I am not prepared to say that Mr. *Rogers*, on this occasion, was actuated by fraudulent designs, or any other motives than a desire to coerce the division of the estate, acquainted with the value of *Rose-Hill*, and subject to the feelings too frequently produced by family disputes; but I do not hesitate to declare, that in the right of his wife, as sole acting executrix of *Nicholas Cruger*, his conduct was not warranted by the will.

The testator ordered his executors to pay each of his children their separate shares, on their arriving to the age of 21 years, and to allow sufficient for their education and support during infancy. This refusal, therefore, to say the least, was illegal, and must, in some measure, have induced a compliance with the confirmatory order, and, consequently, in its operation, have been oppressive to the respondents; and I think it may be denominated a species of fraud, attended with stronger circumstances than are requisite to constitute the third kind enumerated by Lord *Hardwicke*, in the case of *Chesterfield* v. *Jansen*. (2 *Ves.* 155.) The respondents certainly, by their counsel, at the earliest period, evinced a doubt or dissatisfaction in relation to the appraisement, or why, only eight days after filing of the report of the appraisers, enter this rule of reference to a master, whereby each party should be at liberty to except to all or any of the valuations contained in it, touching which the master

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

might examine witnesses, and also inquire into the whole amount of the estate, together with the amount and particulars of the property elected by the appellants. As this rule was by the consent of the counsel on both sides, and the report of the master thereon must have been intended to assist the chancellor in the completion and ultimate confirmation of the appraisement and election, it became equally the duty of both parties to cause this report to be made; and the neglect or omission of the counsel of the respondents cannot be construed into such an unqualified acquiescence, as to vest the property so elected by the widow in her. It still remained open to objections, and the appointment subject to impeachment, on the grounds now taken by the respondents, and could not be deemed complete, until the investigation and report of the master, and confirmation of the chancellor had taken place. In that imperfect state it continued, until the order by consent of the 21st of *May*, 1804, was entered, to which, it appears, the respondents, under the peculiar circumstances already mentioned, assented. The case of *Pursey* v. *Desbouverie* (3 *P. Wms.* 315.) is in some measure applicable, where a daughter of a freeman of *London* accepted of a sum of money, as a legacy, in extinguishment of her orphanage part, and executed a release, though she was told she might elect which she pleased; yet it was held, if she did not know, she had a right first to inquire into the value of the personal estate, and the quantum of her orphanage part, before she made her election; and this was so material that it might avoid the release.

I cannot think that the subsequent acts of some of the respondents to obtain a partition under the statute, can be considered a sufficient confirmation of the appraisement and election, so as to vest the property in Mrs. *Rogers;* but admitting for a moment, that the property elected by her had vested at the time of such election, and that on an investigation before a master, it had been found to exceed one third, either by mistake in the appraisers, or otherwise,

would Mrs. *Rogers* retain that property, and the children be obliged to accept of a pecuniary compensation for the difference? This course would be wholly subversive of the testator's intention expressed in his will; whereby the amount, of such part or parts of his estate, real and personal, or either, as she might choose, is so limited, that on a fair and equitable valuation or appraisement of the same, the part or parts she shall so choose, shall not exceed together the value of one third of his real or personal estate. Such appraisement and election, therefore, could not vest the property, nor could the order of the 21st of *May*, 1804, under the peculiar circumstances of this case, remove the necessity of a reference to a master by the chancellor, for the purpose of enabling him to effect a fair and equitable division of the estate, between the widow and the children, according to the true intent and meaning of the testator. It is consequently on the ground of a mistake in the appraisers, and ignorance and surprise on the part of the respondents, that, in this view of the subject, they will be entitled to relief. The result of my opinion, therefore, is, that the order of the 18th of *September*, 1807, setting aside all the proceedings whatsoever against *Elizabeth Towers*, the mother of *Ann Towers*, *Peggy Towers*, *Catharine Towers*, and *Mary Towers*, who are infants, and setting aside all the proceedings in this cause against the other defendants, subsequent to their putting in their answers to the bill of reversion, which comprehends the appraisement, is correct, and ought to be affirmed.

VAN NESS, J. In the consideration of this cause, the following are the leading and important questions which are presented for decision;

1. Can the decree or order of the 21st *May*, 1804, and the proceedings upon which it is founded, be set aside, on the ground of fraud, mistake, or irregularity, as against all the respondents, or any of them?

*In the margin:*

IN ERROR.

ALBANY, March, 1808.

ROGERS and Wife
v.
CRUGER and others.

IN ERROR.
.....
ALBANY,
March, 1808.

Rogers and
Wife
v.
Cruger and
others.

2d. If the proceedings are regular, as to some of the respondents, but defective as to others, are the whole thereby vitiated?

1. The discussion of the first question, in my view of the subject, is the most important in the cause. It involves a construction of that part of the will upon which the rights in severalty of the appellants depend, and that construction being once ascertained, it will be found to have an almost controlling influence upon every question that arises. To the correct decision of this point, the following parts of the will are necessary to be stated, and particularly attended to, viz.

" I order and direct my executors, herein after mentioned, to make a full and perfect inventory of my estate, as soon after my death as with decency and convenience it can be done.

" The rest and residue of my estate, both real and personal, I will and devise in manner following, that is to say, I give, devise and bequeath one third part thereof to my beloved wife, *Ann Cruger*, and to her heirs and assigns for ever; and it is my will that my said wife may, if agreeable to her, take the said one third part thereof out of such part or parts of my estate, real and personal, or out of either of them, as she may choose, so that on a fair and equitable valuation or appraisement of the same, the said part or parts she shall so choose shall not together exceed the value of one third of my said real and personal estate, as above devised and bequeathed to her.

" I again devise and bequeath the remaining two third parts of my estate, both real and personal, to my children, sons and daughters, as well those of my first marriage as those of my second, (they being all equally near and dear to me,) to be divided, share and share alike.

" It is my will that my said executors, as soon after my death as my said wife shall choose, assign and convey to her the one third part of my estate, real and per-

sonal, as herein before devised and bequeathed to her, and in manner and form as is therein mentioned."

IN ERROR.
.....
ALBANY,
March, 1808.
ROGERS and
Wife
v.
CRUGER and
others.

In the construction of wills the intention of the testator must always prevail, and that intention is to be collected from the whole will, "*ex visceribus testamenti*," and, if possible, full effect is to be given to every part of it. It is, perhaps, needless to remark, that when a will appears to have been legally executed by a person of sound mind and discretion, the distribution which the testator makes of his estate must take effect, however unreasonable or improvident such distribution may appear to be. Courts of justice are to expound, not to make, wills. The right which every man has to dispose of his property after his decease, in such manner as he thinks proper, is founded in wisdom and good policy, and is secured by the laws of this and every other civilized country.

The will in question was executed about nine years before the testator's death, and when most, if not all his children were infants. By that part which I have just recited he directs, and as the first act to be done after his decease, that an inventory of all his estate should be made by his executors. And here I will take occasion to remark that the appellants were competent to make this inventory, without the executors who refused to act; and this was equally proper and necessary, whether the appellants did or did not exercise the right of election given by the will.

The testator then devises to his wife (one of the now appellants) a third part of his estate, real and personal, and gives to her the right to take the same out of such part or parts of the estate, real and personal, or out of either of them, as she might choose, *so that on a fair and equitable valuation, or appraisement of the same*, it should not exceed the value of one third of the whole. It is further provided, in relation to the property elected, that as soon after the testator's death as the election should be made, that the executors should assign and convey the

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

property elected. The remaining two thirds of the estate is devised to the seven children; but it is to be noted that no conveyance is directed to be made by the executors to them. Under these devises, immediately upon the death of the testator, one third part of the real estate vested in the widow, and the residue in the children, the title thereto not being intercepted by any trust devise, directly or indirectly, to the executors. But in relation to the widow's share, she had a right, as soon as an inventory was completed, to convert the interest she held in common with the children into an estate in severalty, and thus, by her own act, to acquire a new interest, and to do what was equivalent, as between her and them, to an actual partition; and this, *by virtue of the will*, she had the uncontrolled power and right to do, without the aid or concurrence of the executors; for as no interest or property of any description was vested in them, they could communicate none to the widow. Her rights were derived from the provisions of the will itself, independent of the executors, who could neither modify, control, or abridge them, and who had no other agency in the transaction than to cause an appraisement to be made, and to see that the part or parts of property elected by the widow did not exceed one third part of the value of the whole estate.

The testator intended to facilitate the exercise of this right of election, as far as he could, and never designed that it should be embarrassed or delayed, much less defeated, by reason of the infancy of his children. One great and important object of the testator was, (for reasons with which we have nothing to do,) to secure to his wife the means, if she saw fit to use them, of separating, according to her own will and pleasure, her part of the estate from that of the children. It is highly probable, however, that the testator supposed an appraisement would be made previously to the making of the election.

The counsel on both sides have supposed that the

knowledge of the appraisement would have given the
widow an undue advantage. I cannot, I confess, per-
ceive any important advantage this would have given
her; but however that may be, of this I am well satisfied,
that it was never the intention of the testator that it
should be concealed from her. How was she to limit
her election to one third of the whole *appraised* value of
the estate, if she had not the means of knowing the
whole amount of that value? She would by that measure
be obliged to grope, as it were, in the dark, without
knowing, had her views been ever so pure and upright,
whether the property elected would exceed or fall short,
of the amount to which she was entitled. If she exceeded
that amount, how was it to be reduced? If she fell short,
how was she to make it up? In the latter case, there
might probably be no difficulty, but in the former, de-
lays, embarrassments, and disputes might arise, which,
before they were terminated, might defeat the election
altogether. The will clearly supposes the election was
to be one single act. It will be seen, upon a moment's
reflection, that if the appraisement had been submitted to
the widow, the election would have been (as it was the
wish and desire of her husband it should be) a plain,
simple and easy operation. She would then have known
to what extent she might go, and shape her election in
such a way as to preclude all delay, and, what was of in-
finitely more consequence, all dispute. Whether I am
right in this or not, does not essentially interfere with
the conclusion I am about to draw, from what I have
before said.

I have already remarked that the right to make the
election accrued at any time when the widow chose to
exercise it, after the death of her husband. I have also
endeavoured to show that the election having been made,
the effect of it would be to convert the estate of the widow
in common with the children, into an estate in severalty,
and that independently of the executors, who, as they
never derived any interest from the will, could impart

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

none to the widow. A necessary consequence from these positions, if they are sufficiently established, is, that a conveyance from the executors was not necessary to the completion of the widow's title. I consider the conveyance from the executors in the light merely of a further assurance, and as affording the evidence that the election had been duly and fairly made; and not as conferring upon the widow any new or additional right. But admitting, that to vest in her the legal estate, a conveyance from the executors was requisite, nothing is clearer than that she had a certain and indisputable equitable interest, which chancery would at all times have recognised and enforced, upon her application, by directing a conveyance to be executed. It will be seen in the sequel, that whether the estate derived from the election was a legal or an equitable one, the consequences will be the same. It is necessary now to examine, whether the appellants have exercised this right of election in such manner as to acquire a vested interest in pursuance of it.

By reason of the refusal of the executors to prove the will, and to take upon themselves the execution of any of the powers thereby vested in them, there was no person who could cause a valid appraisement of the estate to be made, or to execute any writing by which the widow could preserve the evidence of her election, and acquire a proper assurance of her title, in virtue of her election, if that were required. It became necessary for these purposes, *and for these purposes only*, to resort to the court of chancery. In pursuance of an arrangement made between the widow and some of the adults, and by the advice of able and learned counsel, an amicable suit was agreed to be instituted, wherein the appellants were to be the complainants, and the children of the testator were to be the defendants. This proceeding was for the benefit of the parties, who all had an equal interest therein.

The bill was filed accordingly, and the defendants answered it. The bill states all the material facts relating to the premises, which are admitted by the defendants.

The regularity of these proceedings is for the present not noticed. That forms another point in the cause which I shall consider hereafter. For the present I will consider them as regular.

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

The appraisement contemplated by the will was completed, (but by order of the court was not made known to any of the parties,) and was filed on or about the 20th *May*, 1803. The election by the appellants was filed on the 17th *May*, in the same year, designating the parts of the estate chosen by her.

In consequence of the refusal of the executors to act, the execution of the powers and trusts contained in the will devolved upon the court of chancery, (for a trust is never defeated for the want of a trustee,) and that court was, to all intents and purposes, substituted in the room of the executors.

The appraisement, therefore, having been made by competent authority, and the election having been filed, the title became vested in the widow, and, in my opinion, absolutely; but, at all events, in such a manner as to entitle her to a conveyance, or such other writing, as would be competent to render her title complete. It has been insisted upon, and not without effect, that inasmuch as it was unknown whether the property designated in the election, did or did not exceed one third of the value of the estate, that the election was not perfect until the court of chancery should previously examine into that fact, and that until the election should receive the sanction of the court, it was not complete.

Upon the fullest reflection I am satisfied, that the validity of the election cannot depend upon that circumstance. I have before observed, that the difficulty arising from the contingency that the property elected might exceed one third of the appraised value of the estate, is created by the order of the court directing the concealment of the appraisement from the appellant; a measure never contemplated by the testator, but which, if contemplated,

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

could never affect the validity of the election. If the title was never to vest until the chancellor confirmed and sanctioned it, the consequence would be, that the widow might be driven to make several elections, and thus, contrary to the fair interpretation of the will, delays would be incurred, which might defeat the election, and disputes and litigation would be engendered, which the testator studiously endeavoured to avoid. The election could therefore never be avoided on this ground. What effect a gross and palpable mistake in the valuation of the property would have had will be examined, when I consider another point in the cause.

Before dismissing this point, I will briefly state a few other considerations which occur to me on the subject of the election.

The part or parts of the property elected by the widow, the will provides, shall not, upon a fair and equitable valuation thereof, exceed one third part of the estate. Hence it has been inferred, that until an appraisement was made, the right of election did not attach, but that, at all events, no estate was acquired under the election, until it should be confirmed by the trustees. But the very terms of the will import that the election might be made the moment after the appraisement was completed; and if so, the exercise of the right necessarily vested the estate, and this is of the nature and essence of the right, in all cases where an estate is to be acquired by election. The appraisement which was requisite to be made in order to determine whether the part elected did or did not exceed the value of one third of the estate, is a matter of subsequent arrangement and inquiry, but can never operate to defeat or devest the estate which had been already actually acquired, on making the election, unless on the ground of fraud. The right of the widow to the property elected, (or, in other words, her estate in severalty therein,) began by the election. She was bound by that election; and if she was bound, nothing is clearer

than that the children were bound also. The election
fixed and ascertained her separate interest, and cannot
be set afloat by any question about the appraisement,
which might subsequently arise. For these reasons my
opinion is, that upon principles of sound construction,
and according to established rules of law, the widow ac-
quired a vested legal estate, but, at all events, an equitable
estate in severalty, by virtue of her election, and as a
necessary result, the estate thus acquired became vested
the moment the election was filed.

I have taken some pains on this part of the subject on
account of its very great importance in forming a correct
opinion on the remaining questions in the cause.

I will now, as briefly as the nature of the case will
permit, proceed to consider whether the decree of the
21st of *May*, 1804, can be set aside on the ground of
fraud, mistake, or irregularity in the proceedings on
which it is founded.

And first, as to fraud. On this part of the subject, I
will detain the court but a few moments.

Fraud is never to be presumed. It is always to be
made out, either by positive proof, or by the disclosure
of such facts and circumstances as are irreconcilable with
good faith and the principles of morality. Many things
may be illiberal, reprehensible, and, perhaps, even disho-
nourable, which will not in legal signification be deemed
fraudulent, so as to avoid a contract. The evidence to
make out the charge of fraud against the appellants,
principally relied upon, is, that large sums of money in
the hands of the appellants, due, as is contended, to the
respondents, was improperly and oppressively withheld,
whereby they were forced to assent to the order in ques-
tion by an undue and illegal advantage which the appel-
lants took of their necessities.

Undoubtedly, if this charge was supported, their
consent to the order would not be obligatory upon them.
But after all that has been so ably urged upon this sub-

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

ject, I look in vain for such evidence in support of the charge, as a court of justice is bound to demand. I can see a want of courtesy, and of a spirit of accommodation. I can perceive a good deal of that acrimony and hostility which controversies of this kind seldom fail to produce ; but I cannot perceive the formation of a deliberate plan to drive the respondents into an agreement, which nothing but their necessities, occasioned by the improper conduct of the appellants, could have induced them to accede to. They were entitled to large and liberal fortunes under the will in question, and in addition to which they inherited a very large estate, which did not pass under the codicil, on account of a defect in the execution of it. It is impossible for me to believe that, under such circumstances, the necessities of the respondents induced them to submit to the terms of this order, or any other terms which were not reciprocal and proper.

Has there been such a mistake in the valuation of the *Rose-Hill* estate, as that the respondents can be relieved on that ground ?

I have, in the former part of my opinion, endeavoured to show, that the election vested the estate elected in the appellants, and that, as they were obliged to abide by that election, the respondents were equally bound to acquiesce in it. The election, was made, and consequently the estate vested, on the 17th of *May*, 1803.

The value of *Rose-Hill*, at that period, and at no other, is, then, the proper subject of inquiry. The will clearly points to that event, as the time in reference to which the valuation of the estate was to be made. Indeed, this is a point which ought to have been conceded, because it is too plain to be controverted.

What, then, was the value of *Rose-Hill* on the 17th of *May*, 1803 ?

If the respondents are to be relieved on the ground of a mistake in the valuation, at the time I have just men-

tioned, it is not because of a trifling inconsiderable inequality, for then a man would never know when he was or was not bound by his contract.

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

In the language of a wise and upright judge, who understood this doctrine, (Lord *Thurlow*,) " there must be an inequality so strong, gross and manifest, that it must be impossible to state it to a man of common sense, without producing an exclamation at the inequality of it." And he adds, " The principle then is loose enough—looser than I wish to be established in a court of justice."

I do not mean to go very fully into the evidence as to the value of *Rose-Hill*, at the time, when, according to my opinion, it ought only to be inquired into, to wit, on the 17th of *May*, 1803.

Three sworn appraisers, men of integrity and competency, have respectively testified, (for in that light the court are to consider their appraisement,) that in the month of *February*, 1803, they considered *Rose-Hill*, subject to the life-estate of General *Gates* and his wife, to be worth 50,000 dollars. There is no evidence, neither do I know that it is pretended, that between the months of *February* and *May*, there was any change in the value. This testimony must then be taken as establishing the value, until it is completely done away by other counter testimony; not by testimony which leaves the matter in doubt, but by such as to establish unequivocally that the appraisement of Messrs. *Isaac Low*, *Abijah Hammond*, and *John Lawrence*, is grossly and manifestly inadequate.

The testimony relied upon is, 1. That arising from the affidavits of some of the respondents. 2. From the sales made of other property in the vicinity of *Rose-Hill*, cotemporary with the appraisement; and, 3. From sales made posterior thereto.

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

The affidavits of parties in judicial proceedings are to be received with great caution. I doubt very much whether in this case they ought to be received at all. But, taking them into consideration, what do they prove? As far as I can understand them, they furnish no other evidence than that the respondents have a sincere and perfect belief that there has been an undervaluation of this property, a belief founded, in a great degree, however, upon sales made some considerable time after the election had been filed.

The evidence arising from the sales made about the time of the appraisement, and the offer made by *Titus* to *Kip*, in 1802, is equally uncertain and inconclusive.

The evidence derived from the sales, afterwards, and near the time of the order of the 21st *May*, 1804, a year after the election, is inadmissible except in the point of view in which I shall presently consider it.

It is a rule as well settled as any that can be stated, that when a contract is made for the sale of real or personal property, without fraud, and which is obligatory on both parties at the time, that no change in the subsequent value of it, can be alleged by either party, for the purpose of rescinding it. If it depreciates, nay, if it be absolutely destroyed by conflagration, earthquake, or in any other way, the purchaser must pay the stipulated price. If its value is increased by the discovery of mines, the founding of a village or city, or by any other means, which occasion an appreciation in the value, no matter to what extent, the vendor is bound, on receiving the consideration money, to execute a conveyance. This is a maxim in our law, known to every man, and it would be trifling with the time of the court to cite cases in support of its existence or reasonableness. The sales made subsequent to the election, about the time of the order of the 21st *May*, 1804, and afterwards, undoubtedly prove that at that period there had been a most rapid and unexampled rise in the value of property generally, in

the neighbourhood of the city of *New-York.* Whether, however, the astonishing prices for which property has been selling there, furnishes us conclusive evidence of the intrinsic value of the property, time only can unfold.

The difference between the appraised value of *Rose-Hill,* and the probable increased value of it, in the spring of 1804, may, perhaps, in a great degree, be accounted for, from natural as well as adventitious causes. The yellow fever raged with great violence in the autumn of 1803. The prosperity of our country producing a most rapid increase of population, wealth and commerce, are circumstances which of themselves would explain the reason of the difference. At any rate, the sales I have last mentioned can never afford that kind of evidence which can countervail the testimony of the three appraisers.

But there are other considerations of great weight on this part of the subject. During the whole of the period which intervened between the filing of the appraisement and the making of the order of the 21st *May,* 1804, the respondents had an opportunity of excepting to the appraisement. They, however, did not except to it. In this interval of time, also, according to the evidence of Mr. *Benson,* negotiations were carried on between the counsel of the parties, and with the privity of the respondents, which finally terminated in the agreement contained in the order last mentioned, in all which he says " he never heard a complaint, suggestion, or intimation, that any parcels or articles of the estate had been appraised too high or too low." Mr. *Harison* testifies to the same effect. After the appraisement, and for a long time thereafter, the respondents acted upon the order of the 21st *May,* 1804. They received property under it to a very large amount. They proceeded to take measures for making partition of that part of the real estate which fell to their share in consequence of the election and order. I cannot but consider after all this, that they are bound (I mean the adult respondents at least) by the appraisement.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

I come now to that part of the case which he most difficult, and which presents the only questions about which I think there is much ground for a difference of opinion. I mean the regularity of the proceedings in the court of chancery, which terminated in the decree or order of the 21st *May*, 1804. And here in common with this court and the parties, I have reason to lament the unavoidable absence of three of my learned brethren, by which we are deprived of the benefit of that aid which their experience and wisdom is so eminently calculated to afford.

I shall in delivering my opinion on this part of the case, notice but a few of the many exceptions which have been insisted upon. Those not mentioned are to be considered either as having been sufficiently answered, or waived.

At the time of filing the original bill and answer, which was the 18th *May*, 1801, the respondents, *Bertram Peter Cruger*, *Henry N. Cruger*, *Nicholas Cruger*, and *Betsey Towers*, were of age. The respondents *Catharine Cruger*, *Polly Cruger*, and *Sarah Cruger*, were infants. *Catharine* became of age the 7th *May*, 1802, and married the respondent *William Bard*, in *October* thereafter. *Mary* was of age on the 24th *September*, 1803, and was married to the respondent, *Henry Cruger*, jun. in *August*, 1802. *Sarah Cruger*, married to *William Heyward*, is yet an infant. All the adults, except Mrs. *Towers*, it is agreed, were regularly before the court. For the purpose of expressing my opinion, it is material only to consider whether the children of Mrs. *Towers* were improperly made parties to the suit, and whether Mr. and Mrs. *Bard*, and Mr. *Henry Cruger*, jun. and *Mary* his wife, were so far parties on the 21st *May*, 1804, as to be bound by the order entered on that day.

First, as to *William Bard* and his wife, and *Henry Cruger*, jun. and his wife.

*William Bard*, and *Henry Cruger*, jun. became inte-

rested in the cause, in consequence of the irrespective marriages with two of the daughters of the testator.

In no case where a *feme sole* is a party defendant, and marries pending the suit, does the suit abate at law? It proceeds as if she remained a *feme sole.* In equity it is necessary that the husband be made a party; sometimes he is made so by the mere order of the court, on suggesting the marriage; he may be made a party also by inserting his name in the proceedings; and there can be no doubt, if his name is thus inserted, with his consent, and he afterwards acts in the progress of the cause, in consequence thereof, in the character of a party, that he is bound by the decree and orders that shall be made. If a party, after an irregularity has taken place, consents to a proceeding, which, by insisting on the irregularity, he might have prevented, he waives all exceptions to the irregularity. This is a doctrine long established and well known. *Consensus tollit errorem* is a maxim of the common law, and the dictate of common sense.

On the 23d *February*, 1803, after the marriage of Mr. *Bard*, (but when his wife was still an infant,) and *Henry Cruger*, jun. whose wife was then of age, they for the first time appear in the proceedings. They then united in a petition to the chancellor for certain purposes, which it is not necessary here to mention, but which related to this cause. This was then their own act, and can be considered as done by them in the character of parties only. The court of chancery proceeded to make an order upon this petition, thereby considering them as parties, and they not objecting to such order, waived all exception, afterwards, as to the form in which they were made parties.

On the 21st *May*, 1804, when all the respondents, except Mrs. *Heyward*, and the children of Mrs. *Towers*, were of age, the order was made for confirming the appraisement and election, and discharging the reference to the master, and for other purposes. This order was

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

made by consent, which the adults at all events were competent to give. In the title of the cause on this occasion the names of *William Bard* and wife, and of *Henry Cruger*, jun. and wife, appear as parties. From this I think the conclusion necessarily results, that if any irregularity existed in the proceedings previously to the 21st *May*, 1804, that the adults, voluntarily consenting to this order, waived them, and that the order was obligatory as to them, to the same extent and in the same manner, as if no irregularities had ever existed. I consider then that the only remaining question on this part of the subject is, whether the infant children of Mrs. *Towers* were ever regularly made parties.

Much has been said with respect to Mrs. *Towers* never having been regularly and legally a party. I pass over what has been urged on that subject, as not material, in my apprehension of the question relating to her infant children.

After the appellant, *Ann Cruger*, intermarried with *William Rogers*, the suit abated. It could be continued only by filing a bill of revivor, and this was the course pursued. At this time, Mr. *Maitland* and his wife were both dead, and of course were no longer parties. The infant children of Mrs. *Towers*, residing without the *United States*, succeeded to the interests of their mother, at least as to the realty, and, to be bound by the order of the 21st *May*, 1804, must have been parties to it. To make them so, the complainants proceeded under the provisions of our statute. And the question is, whether they were, in virtue of this proceeding, regularly brought into court?

I have just stated, that after the marriage between the complainants, the whole suit abated, and a bill of revivor became requisite to continue it. To this bill it was necessary the respondents should answer, which (except the children of Mrs. *Towers*) they did. This was, in one sense, an original proceeding. The com-

plainants have proceeded against the children of Mrs.
Towers, as if the original suit had not abated by the
marriage between the appellants. But the answer of
Mrs. Towers, admitting it to be good, was in a suit
where Mrs. Rogers, then a *feme sole*, was the complain-
ant. That answer can never " be deemed and taken as
and for the answer" of her infant children, pursuant to
our statute, in the revived suit, wherein both the appel-
lants were complainants. This case is, therefore, not
within the statute, and the children of Mrs. Towers
consequently were not parties. But admitting the case
to come within the statute, there is another objection to
this proceeding. I cannot admit that our statute ex-
tends to the case of infants; nor do I believe that in any
case, the answer of a deceased defendant can be made
the answer of the representatives, provided such repre-
sentatives are infants. The statute provides, that the
rule or order to revive a suit against the representatives
of a deceased defendant " shall be served on the adverse
clerk;" and unless " they shall, within eighty days after
such service as aforesaid, appear and put in their an-
swer, or signify their disclaimer of the suit, and the
matters in controversy therein, the plaintiff or plaintiffs
may cause their appearance to be entered, and in such
case the answer of the deceased person shall be deemed
and taken as and for the answer of such representative,
or other persons interested by the death of such person."
Now the answer of the deceased is to be taken as the
answer of the representative, provided certain things
are not done. This can relate only to adults who are
competent to perform those things. It is a fundamental
rule of the court of chancery, that infants are not to be
prejudiced by any *laches* which is not waived, after
they become of age; and it is, therefore, that infants can-
not be bound under a proceeding upon this part of the
statute, which does not in its terms extend to them. The

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others

children of Mrs. *Towers* were therefore never parties to this suit in any shape whatsoever ; and, consequently, are not bound by the order of the 21st of *May*, 1804. To what time the proceedings as to them ought to be set aside, might, if it were material to the appellants, present another question; but as there can be no use in modifying the order appealed from in this respect, it is unnecessary for me to consider it. The appraisement was made after their mother's (Mrs. *Maitland's*) death, and after that fact was known to the appellants. Not being parties to the suit, they are not bound by the appraisement, and the appellants, as to them, must hereafter proceed as they shall be advised. But, in order to support the proceedings against the infants, it has been urged that the petition presented by the guardians, on the second argument of the application for a rehearing, ought to have been acted upon by the chancellor. In this petition they offer to waive all the irregularities. The answer given to this by the chancellor appears to me to be satisfactory. The offer was coupled with certain reservations, which rendered it difficult, if not impracticable, to be carried into effect. But there is another, and to my mind, a satisfactory answer. The chancellor, as the paramount guardian of all infants, is not bound to make any order in the case of infants, which is not for their benefit. I am not prepared to say, that any order which could be made upon this petition would be for their benefit, under all the circumstances of the case ; I therefore lay this petition out of the question.

But, although the proceedings as to the infants are irregular, it by no means follows that they are not obligatory upon the other respondents, who, in the making the order of the 21st of *May*, 1804, were of age, and regularly, as I have endeavoured to show, before the court. And this brings me to the last material inquiry involved in this cause.

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

What effect will the defect in the proceedings against the infant respondents have upon those against the respondents, which are regular? On this part of the subject I shall be very brief; for I take it for granted, that very little need be said to show, that in every point of view, the order of the court below, setting aside the proceedings against the adult respondents, cannot be supported. In most cases, *all* the persons who may be affected by a decree of the court of chancery, must necessarily be made parties. There are cases also where although they *may*, yet it is not absolutely necessary that they should, all be made parties.

Whether the children of Mrs. *Towers* are of the one or the other description, is not material, for, in either case, the result will be the same, and equally tend to show most demonstratively that this part of the order appealed from ought to be reversed. Let us suppose for a moment they (the children of Mrs. *Towers*) were necessary parties before the order or decree of the 21st *May*, 1804, could be made, what ought the chancellor in this case to have done? Most obviously, he should have told the other respondents they ought to have made that objection at the time when that order was about to be entered; and although he might have permitted them to urge this defect on the petition for a rehearing, they ought not, by their own omission, to be placed in a better condition than they were in at the time when the order was entered. Suppose this objection had been urged at the time the order of the 21st of *May* was about to be entered, what would then have been the duty of the chancellor? Certainly not to set aside all the previous proceedings against the adult respondents. He would have suffered the cause to stand over for want of parties, and then the complainants (the now appellants) might have pursued the proper course to bring them into court; and this is

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

the invariable practice of the court of chancery, even upon the final hearing of the cause.

On the other hand, if the children of Mrs. *Maitland* might have been made parties, though they were not necessary parties, it is certain that the omission to make them parties could, in no possible manner, vitiate the proceedings against the adults. That part of the order appealed from, therefore, ought to be reversed.

Much has been said in the course of the argument to prove, that in consequence of the delay which took place in making the assignment of the stock which fell to the share of the respondents, they have suffered a heavy loss, by reason of the depreciated value of it; and it has been insisted that the respondents are entitled to some relief from this court on that ground. This is a minor question in the cause, but which, notwithstanding requires some consideration. The administration of this estate, in relation to the personal property, is yet before the chancellor. If, on the closing of this transaction, on the final liquidation of the accounts, this should be considered a valid claim on the part of the respondents, (and on this I give no opinion,) the chancellor, upon a proper application, is competent to enforce it. To do the respondents justice in this respect, it is surely not necessary to set aside the order of the 21st of *May*. The non-performance, on the part of the appellants, of that order, can never be a ground for vacating it.

I have, I am sensible, consumed much of the time of this court in giving my reasons for the opinion I have formed in this cause. But the importance of the decision about to be pronounced, and the very great responsibility which attaches to all who participate in that decision, render it necessary for me to detain the court a few moments longer.

If the order of the 21st of *May* is set aside, as it respects the children of Mrs. *Towers* only, and is permitted to stand as to the other respondents, there can

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

be no difficulty in the consequences which will flow from it. The election as to all the respondents being established, the rights of the parties can be easily ascertained, and will admit of but little room for future controversy, if the parties are disposed to peace. The question as to the value of *Rose-Hill* will be open to inquiry, as between the appellants and the children of Mrs. *Towers*, and the interest of all the respondents in the property not elected by the appellants, will remain in the same state, as if the whole of the order of the 21st of *May* were established.

There are many other important considerations which might be urged against setting aside the order of the 21st of *May*, 1804, which I forbear to mention. Mrs. *Heyward* is no party to the petition for a rehearing, neither is she a party now before this court. This circumstance has not been without its influence in producing the opinion I have formed.

I am, therefore, of opinion, that such part of the order appealed from, as directs all the proceedings purporting to have been had against the children of Mrs. *Towers*, to be set aside, be affirmed, and that the remaining part of the said order relating to the proceedings against the other respondents, be reversed.

KENT, Ch. J., THOMPSON, J., and SPENCER, J., were absent.

CLINTON, Senator. This cause has derived importance, not only from the magnitude of the property which it involves, but from the long and animated discussions, the eloquent appeals, and the learned researches, which have been exhibited in this place. After an attentive hearing and mature deliberation, we are now called upon to pronounce our decision.

*Nicholas Cruger*, the former husband of the female appellant, and the father and grandfather of the respond-

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

ents, died possessed of a large estate in houses and lands, money and stock, of various descriptions. He left six children by his first marriage, and one by his second. Four of the children had arrived to full age, and three were infants, when the proceedings upon which this appeal is founded were commenced. By his will, dated several years before his death, he left one third part of his estate, both real and personal, to his wife and to her heirs and assigns for ever; and he directed that his wife might, if agreeable to her, take her third out of such part or parts of his estate, real and personal, or out of either of them, as she might choose, so that, on a fair and equitable valuation or appraisement of the same, the said part or parts so chosen by her should not together exceed one third of his said real and personal estate. The remaining two thirds were given to his children, to be divided among them, share and share alike, to be paid on their severally arriving at the age of twenty-one, and the income of the proportion of the minors was to be applied, during infancy, to their support and education, and to be paid to them, or for their use, either annually or otherwise, as occasion or their necessities might require. The wife and three friends of the testator were appointed his executors, with full power to sell and convey his real estate; and his executors were directed, as soon after his death as his wife should choose, " to assign and convey to her the one third part of his estate real and personal, as before devised and bequeathed to her, in manner and form as is therein mentioned."

The friends of the deceased declined to act as executors, and the administration of the estate fell to the widow, who took upon herself the trust. The persons thus appointed to apportion the estate under the will, and with full power over the subject, having refused to serve in that capacity, serious difficulties arose, as to the allotment of the widow's share. Three of the heirs were infants, and one of the adults, Mrs. *Towers*, was in a fo-

reign country. An arrangement among the devisees and legatees would not only be inconvenient, as it respected the absent one, but in relation to the minors, it would not be binding. Under these circumstances, the female appellant called to her assistance counsel learned in the law, who advised her to institute an amicable suit in chancery, for the purpose of appropriating to herself her share, and of silencing all future controversy. The suit was instituted. In its progress through the court, the parties became hostile. The proceedings became complicated, and were spun out to a great length, and hearing after hearing, order after order, and decree after decree, having taken place, we are now to decide upon an appeal from an order of the court of chancery, which has set aside all the proceedings in the cause against the infant children of *Elizabeth Towers*, one of the heirs, and all the proceedings against the other respondents, subsequent to the putting in their answers to the bill of revivor.

IN ERROR.
.....
ALBANY,
March, 1808.
ROGERS and
Wife
v.
CRUGER and
others.

The cardinal point of controversy is the valuation of a part of the estate known by the name of *Rose-Hill*, and a lot in its vicinity. The improper motive, and the incorrect conduct charged against the appellants, and the irregular proceedings alleged to have taken place, are all exhibited with a view to operate upon that subject; and in order to present auxiliary inducements to the court, in case of too low an estimate of that property, to allow the respondents to come in and divide it, according to its real value, with the appellants. In order to decide properly on this controversy, it will therefore be necessary to inquire,

1. Whether the property at *Rose-Hill* and in its neighbourhood, was really fixed at too low a price?

2. If it was, whether the respondents are concluded by any subsequent acquiescence, or any proceeding in the cause; this court taking into view the infancy of some of them, the conduct of the appellants to others,

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

and any irregularities that may have occurred in the management of the suit.

In determining the value of *Rose-Hill*, it is of primary importance to fix upon the period of estimating it; and in order to do this with propriety, it is necessary to retrospect to the will. The trustees, if they had acted, would undoubtedly have been at liberty, at any time before the allotment to the widow, to have calculated the value of the estate. Indeed, it would have been their incumbent duty, if a sudden and extraordinary rise had taken place in the value of any portion of the property, to have revised and corrected their valuation, at the very moment, when they were about executing the conveyance to the widow, under the will. Suppose, for instance, that they had compiled a schedule of the estate, had appraised the value of the parts, had estimated *Rose-Hill* at 50,000 dollars, and, on the 20th of *May*, 1804, had given directions to counsel to have the writings made out for their signature, on the next day, (the day on which the election and appraisement were confirmed by the chancellor,) and suppose that when, on the eve of executing the conveyance, it was satisfactorily established to them, that the land at *Rose-Hill* was greatly undervalued, and that it was worth 100,000 dollars; is there a man who hears me that would hesitate to say, that it was not the duty of the trustees to throw aside the writings, and to make a new appraisement? The proceedings in chancery were instituted with a view to remedy the evils that resulted from the declension of the trustees. The chancellor stood in their place. He was to make an equitable allotment under the will, and at any time before he made it, or, in other words, confirmed the appraisement and election, it was proper and obligatory on him to correct the valuation, and to see that it was fair and just. In deciding on the value of *Rose-Hill*, the proper era to select is the 21st of *May*, 1804. The time

IN ERROR.
.....
ALBANY,
March, 1808.

Rogers and
Wife
v.
Cruger and
others.

in which the appraisement was made is not the time to govern us. The appraisers were not necessary, under the will. The chancellor himself ought to have made the valuation. The regular course of the court would, indeed, have been to have directed the master to report a schedule of the estate, and the value of the several parts, and then, after the election of the widow, to have referred the subject to the master, and on his report to have examined the whole case, and to have confirmed or annulled the election, as equity should prescribe. The appointment of appraisers was a substitute for the master, who would unquestionably have called in well informed men, and have taken their opinion, under oath, of the value of the property. But as the chancellor considered the appointment of commissioners as the most eligible mode of informing his conscience, I certainly do not object to the measure; but I contend that when the appraisement was exhibited to the chancellor, and he was called on to decide on its merits, that the 21st of *May,* 1804, the period he was so called upon, not the 7th of *March,* 1803, the date of the appraisement, was the proper time at which to calculate the value of the property.

It is not correct to say that the value must be considered as definitively established, at the time of the election; that previous to it, the widow was a tenant in common, with the heirs, but that the election severed the estate, and made her a tenant in severalty of the property elected. The admissions of the appellants themselves contradict this position. In the decree of confirmation of the 21st of *May,* 1804, entered by the consent of the parties, the sanction of the court to the validity of the election was deemed essential. If, previous to the confirmation, and after the election, any public calamity had occurred which would have diminished greatly the value of the property selected, it would have been competent for the appellants to come in and protest against the con-

IN ERROR.
· · · · ·
ALBANY,
March, 1808.
ROGERS and.
Wife
v.
CRUGER and
others.

firmation. For instance; if an earthquake had swallowed up the place, or if an inundation of the ocean had swept it away, it would be hard and unjust to tie down the appellants to their selection. In like manner, any extraordinary rise in the value of the lands ought not to be confined to them; but the loss should fall on the estate generally, and the advantage be dispensed in the same way. Before confirmation the party is not bound. This principle is recognised in the case *Ex parte Miner.* (11 *Ves.* 559.) A person purchased an estate before a master, and presented a petition to have the report of the master confirmed; but before any order was made, a barn and stable, part of the premises, were destroyed by fire. The lord chancellor decided, that the loss should not fall on the vendee, but that it should be deducted from the purchase-money, upon the ground that no right or interest passed in the property, until confirmation. The election, in this case, was in the nature of a purchase or investment of a certain interest, springing out of the will in certain lands, and the appellants could obtain no permanent interest, until the court gave to their selection the stamp of its authority. A question, however, of very considerable importance, presents itself, in relation to the nature of the confirmation of the 21st of *May*, 1804. The decree states, that the writing purporting to be the election by the appellants, of the several parcels, or articles, as the one third part of the estate devised to the female appellants by the testator, shall be deemed to be confirmed; but to remain in the hands of the master, subject to the further order of the court. And the whole complexion of the decree evidently shows that something ulterior was to be done, that the final settlement was postponed, and that the court reserved to itself the right of modifying, of changing, or of setting aside the arrangement, as long as matters in controversy, or for adjustment, remained before it.

The *Rose-Hill* farm contains ninety-two acres, and has

a spacious house and suitable out-houses. It is less than one mile from the paved streets of the city of *New-York*, and about three miles from the *City Hall*. It is washed on one side by the waters of the *East River*, and is bounded on the other by the great post road, which, after proceeding a few miles, spreads itself in three directions; one to *Hell-Gate* ferry, which communicates with *Long-Island*, and the remaining two routes to *Harlaem Bridge* and *King's Bridge*, the only avenue to the continent. In point of situation and aptitude of conversion into town lots, for the accommodation of the citizens of *New-York*, it is unequalled. The extension of *Orchard-street*, as has been for a long time contemplated, and has been commenced by the corporation, through the lands of *Stuyvesant* and others, and this farm, will enhance its value beyond all conception. A person, called upon in *May*, 1804, to estimate the value of *Rose-Hill*, ought to have calculated, not its value in gross or in mass, as it would bring under the hammer, without any favourable terms of credit, and not well husbanded or managed; but he would have taken into consideration its favourable position, its propinquity to the city, the sales of the neighbouring lands, the intended extension of *Orchard-street*, and the immense price which the place would bring, when converted into town lots. He would also consider, that the great augmentation of the value of property, on the island of *New-York*, did not arise so much from any extraordinary visitation of Providence, as from fixed and continually operating causes. An immense mass of population was confined within a narrow strip of land surrounded by the waters of the *Hudson* and *East Rivers*. This mass was invigorated by industry, enriched by commerce, animated by enterprise, and was progressing with a rapid and unceasing step. It was breaking with irresistible force through the limits in which it had been confined, and was extending itself, with astonishing celerity, into all parts of the country,

*IN ERROR.*
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

The rise of land in the vicinity of the city was then as certain as the extension of the city, and as its increase of inhabitants. This population was not only augmented by natural increase, but by crowds of strangers from *France*, from *Great Britain*, from *Ireland* and the *West Indies*, who took refuge in our peaceful clime from the ravages of war and the oppressions of despotism. The commercial and enterprising genius of *New-England* also perceived that *New-York* was destined by nature to command the commerce and to be the great store-house and emporium of two-thirds of the *United States*, and to that place her sons resorted from all quarters, and prospered. That dreadful pestilence, which exhibits death in its most terrific forms, had visited the city in the summer and autumn of 1803, had compelled its inhabitants to retire from the scene of agony and horror, and had inculcated a general impression, that to obtain safety in future, it was necessary to retire in season into the country.

In order to illustrate the predominance and influence of that opinion, it is only necessary to say, that in 1805, when the yellow fever again appeared, the commercial and exposed parts of the city were immediately and generally evacuated, the citizens having purchased or procured, in season, places of retirement and safety ; and that when it prevailed in 1798, owing to the neglect of this salutary precaution, the ravages of the disease were dreadful. The sales at *Kip's Bay*, which took place on the 16th of *May*, 1804, five days before the confirmatory decree in this cause, exhibit, in the strongest point of view, the operation of the causes I have just mentioned, on a favourable local situation, and after a visitation of yellow fever. *Kip's Bay*, where the lots sold are situated, is near half a mile further in the country, and the land sold on an average at a sum exceeding 2,000 dollars an acre. *Rose-Hill*, if divided into lots, would certainly have brought more. Exclusive of streets it would pro-

duce at least a thousand building lots, which, at the low rate of 250 dollars a lot, would amount to 250,000 dollars. The sales of *Bridgen's* property by the master, on the 5th of *August*, 1803, produced, on an average, 530 dollars per acre; but the situation is not so favourable; some of the parcels were large, and it is probable that the title was suspicious. But this is not a contemporaneous transaction. It took place nine months before the confirmatory decree. The testimony of *Titus* relates to *June* or *July*, 1802, when he states that he could have purchased at *Kip's Bay* for four hundred pounds an acre. The subsequent sales by *Hone* show the rapid rise of prices after that period. The fact of the appraisers valuing *Union Hall*, which is six miles out of town, and not one fourth as valuable per acre as *Rose-Hill*, at 625 dollars per acre, shows, demonstratively, the little reliance that can be reposed in the estimate. The circumstance that it was encumbered with the lives of General and Mrs. *Gates*, is, no doubt, a great deduction from its value. The general was, at the time of the appraisement, seventy-five years old, and is since dead, and his lady was sixty-three. To allow seven years for the falling in of the two lives, and 2,000 dollars *per annum* for the estate, would be 14,000 dollars, which, added to the 50,000 dollars, would make 64,000 dollars, a sum totally inadequate, at the time, even when the appraisement was made. I reject the calculation of Dr. *K.* as an absurdity on the face of it. He claims for the tenants for life upwards of 41,000 dollars. His calculation is founded upon an arbitrary hypothesis. He assigns no sufficient reasons; and, from a letter read in court, (which is not in the printed case,) it appears, when called upon by the appellant for an exposition of the grounds of his calculation, that he wraps himself up in mystery, exacts blind and implicit confidence, as the price of ten years' study and profound meditation. The mysteries of his calculations, like the *Eleusinian* rites, are to be concealed from

IN ERROR.

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

IN ERROR.
•••••
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

vulgar eyes, and it is sufficient for him to say, *Hoc volo, sic jubeo, sit pro ratione voluntas.* No man who knows any thing about the situation of *Rose-Hill,* but would be perfectly convinced that 25,000 dollars would be a great and exorbitant price to buy out the present incumbent. Upon a view of the whole case, from a personal knowledge of the property, from a comparison with other and contemporaneous sales, and from a careful retrospect to the situation of real property, at that period, I have no question but that *Rose-Hill* was greatly undervalued by the appraisers, and that between that period and the time of the confirmatory decree, it had greatly increased in value. When some of the respondents, afterwards, offered to pay 100,000 dollars, on a short credit for *Rose-Hill,* subject to the encumbrance of General and Mrs. *Gates's* lives, they did not offer its value. At that price they would have made a most lucrative bargain.

But allowing all possible force to the inadequacy of the price, it becomes now an important inquiry, how far a circumstance of that kind can have weight in this court. The respondents, it will be said, have all declared their consent to the election. The infants are bound by the acts of their guardians, the adults by their own stipulations, and the records of chancery rise up in judgment against them. It is well established, that in making a bargain, a mere inadequacy of price will not, alone and unsupported by other circumstances, be sufficient to set aside a contract. The case of *Heathcote* v. *Paignon* (2 *Bro. Cas.* 167.) speaks this language. This was an application to set aside an annuity, where there was 23 *per cent.* clear profit, with a certainty of the principal being secure, and where the terms were such, as to show evidently the distress of the party. The lord chancellor in pronouncing his opinion in this case, said, " if mere inadequacy is the ground, it should seem that it was scarcely sufficient, but there is a difference between that and evidence arising from inadequacy : if there is such inadequacy, as to show that the person did not under-

IN ERROR.
.....
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

stand the bargain he made, or was so oppressed, that he was glad to make it, knowing its inadequacy, it will show a command over him which may amount to fraud. If the transaction be such as makes overreaching on one side, and imbecility on the other, it puts the parties in such a situation as to show that it could not have taken place without superior powers on the one side over the other." And an able commentator, (*Powell on Contracts,* 156.) in remarking on this case, says, " that the circum-stances which furnished evidence of the seller's having been distressed, and that his distress was taken advan-tage of in this case, seems to have been the buyer's hav-ing been acquainted with the seller's want of money, and his having enthralled him, (the seller,) by suffering him to contract a debt, by which means the buyer had him so far within his power, as that he might have distressed him, on his non-compliance with his own terms." The reporter of this case adds, in a note, that in a case in the exchequer, in 1787, (*Griffith* v. *Spratley,*) the lord chief baron determined, " that there was no case where mere inadequacy of price, independent of other circumstances, had been sufficient to set aside a trans-action." In the case of *Gwynne* v. *Heaton,* (1 *Bro. Cas.* 1.) Lord *Thurlow* observed, " that to set aside a con-veyance on that ground solely, there must be an inequali-ty, so strong, gross, and manifest, that it must be im-possible to state it to a man of common sense, without producing an exclamation at the inequality of it." Ap-plying the spirit or principle of these cases to the cause before us, we are led to this conclusion, that the parties are concluded, or estopped by their own agreement or consent, in the court of chancery, if no other objection can be brought forward than the low price of *Rose-Hill.* But it is to be observed, that slight circumstances con-nected with great inequality, will induce a court to inter-fere and correct the evil. In the case of *Pope* v. *Roots,* (1 *Bro. P. C.* 370.) it was held that " inadequacy of price alone is not, when all parties are informed respecting that

IN ERROR.
·····
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

about which they are contracting, a sufficient ground for a court of equity to refuse to give its sanction to a contract, unless the consideration be inadequate in a degree that will warrant the court to conclude fraud, from the internal evidence the transaction itself furnishes; yet it is a strong inducement to a court of equity, to seize *upon any other ground* that the case may furnish, which coupled with that, may warrant it to interfere against the inadequacy." And in the case of *Morse* v. *Royal*, (12 *Vesey*, 373.) the lord chancellor declared, "if the court can discover that some advantage has been taken, some information acquired, which the other did not possess, though it is not to be precisely discovered, inadequacy, without going to the length of requiring it to be such as strikes the conscience, will go a vast way to constitute fraud."

If, therefore, any strong circumstances can be presented to this court, which can be connected with the low price of *Rose-Hill*, we can have no hesitation in decreeing in favour of the respondents.

And, 1. It is alleged, that the appellants, probably, obtained information of the appraisement of *Rose-Hill*, and regulated their selection accordingly, which gave them an unjust advantage over the respondents. Mrs. *Rogers* had, under the will, an unrestrained right of selecting one third of such of the property as she chose. In the exercise of this right, she ought not to invade those of others. The appraisers were not sworn to secrecy. They were only sworn to a faithful execution of their trust. The object of the appraisement was to enlighten the chancellor, not to inform the parties, and all that Mrs. *Rogers* could expect under the will, was the liberty of selecting her favourite objects, without any reference to, or knowledge of, the specification of the value. If, therefore, she was informed of the appraisement, and regulated her selection by the undervaluation of a particular article, not by a just exercise of the right of choice, she had an undue

advantage, which ought not to be tolerated. The necessity of arresting an inference of this kind was so obvious to the appellants, that they have come forward with testimony. Their own oaths in this case would have silenced all suspicion; but the mode in which their testimony appears, creates an irresistible conclusion against them. *Low* and *Lawrence*, two of the appraisers, declare that they did not disclose to the appellants or to any other person or persons, except to themselves, as associate appraisers, the value affixed by them to the estate of the testator, or *any part thereof.* *Hammond*, the other appraiser, testifies that he never divulged the value affixed by them to the estate of the testator. This latter deposition only goes to an immaterial point. The disclosure of the *total value* was nothing. The substantial matter was a divulging of the value *of the parts*, which enabled Mrs. *Rogers* to compare them, or some of them, together; to select those that were valued low, and to reject those that were estimated high. This omission or silence is emphatically expressive. The affidavits of the appraisers were all written by the same hand, and taken on the same day, and before the same master. It is of no consequence where the affidavits were taken, whether in *West-Chester* or in *New-York*. A material fact is omitted, which enforces a belief that *Hammond* did disclose the appraisement of *Rose-Hill*, by which means it reached the appellants; and it will not answer to talk about honour or refined sentiment on this occasion, if the party deems it essential to establish a fact, and fails in the attempt. If the court consider it also important, the failure must recoil, with double force, against him. In justice to Mr. *Hammond*, it is proper to state that his affidavit is by no means incompatible with a disclosure of the value of *Rose-Hill*. In the mode in which the charge of knowing the value has been met and repelled, I must conclude that it is really well founded.

2. It is charged to the appellants, that they unjustly withheld the property of the respondents, which had

*IN ERROR.*
.....
ALBANY,
March, 1808.

Rogers and
Wife
v.
Cruger and
others.

IN ERROR.
·····
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

great influence in inducing them to close with the ap-praisement, whereby their interests were sacrificed.

The appellants, in relation to all the heirs of *Nicholas Cruger*, were in direct opposition. It was their interest to go beyond the third allowed in the will, and the interest of the heirs to prevent it. This hostility of interests rendered the position of the appellants peculiarly delicate, because to it was superadded the character of trustees, which invested them with the possession and management of the whole estate, and which enabled them to withhold supplies from their opponents, and to exercise a controi over their will. As trustees they were possessed of two-thirds of the estate, and in their own right they held the other third. If, therefore, to augment their own shares, they made use of their power as trustees, they stand without any claim to the favour of the court of equity.

Perhaps, it cannot be emphatically said that advantage was taken of the necessities of distressed men. Whether the wants of the heirs were real or factitious, whether they originated from a desire of exhibiting themselves in expensive life, or proceeded from an intention of supplying their families with necessaries, we shall not now undertake to ascertain. We know that they were desirous of obtaining possession of the property bequeathed to them, and that it was withheld, until they acquiesced in the election of Mrs. *Rogers*. We also know that they sup--posed it necessary for the support of their families; that Mr. *Bard* applied to the agent of the estate, and was refused; that Mr. *Henry Cruger*, jun. applied to Mr. *Rogers* in person, and was refused; that both the appellants gave the agent a general direction not to make any more advances; that Mr. *B. P. Cruger* applied in writing to Mr. *Rogers*, and was refused, until a *final settlement* should take place; that they did not receive any money for nineteen or twenty months, and were so pressed that two of them had to borrow money, and that

upon ther assent to the decree of the 21st of *May*, 1804,
an arrangement was made for satisfying their wants;
that Mr. *Bard*, for the first time, received money, in the
following *June*, and that Mr. *H. Cruger*, jun. also par-
ticipated; and that the ground which Mrs. *Rogers* took,
in protesting against a partial settlement, was aban-
doned; that the very decree went upon the ground of a
partial distribution; and that it actually took place, when
his object was accomplished. He also knew that Mrs.
*Rogers*, during her widowhood, had divided the cash in
bank, without incurring risk or any responsibility; that
Mrs. *Henry Cruger*, jun. was an infant, and that it was
expressly enjoined on the trustees to support her in her
minority; and any of his counsel could have told him, that
he run no hazard in making advances to the children,
within their proportions. Although I am far from say-
ing that any systematic design of coercing the heirs was
meditated by Mr. *Rogers*, and am disposed rather to at-
tribute the interruption of supplies to that high state of
feeling and irritation which unfortunately attends family
quarrels; yet it is sufficient to know that this dispute,
with whatever views it was managed, and from whatever
cause it originated, had the effect of operating unduly
upon some of the respondents, and of hastening or pro-
ducing their compliance, without a full and fair view of
the ground on which they stood.

3. It is obvious that great irregularities have taken
place in the management of this cause; that the rights
of infants have not been protected with that circumspec-
tion which the law requires, and that, particularly, one
of the heirs, Mrs. *Towers*, and her orphan children,
have been unduly and irregularly brought before the
court.

The original answer of Mrs. *Towers* was signed by a
solicitor, without any authority. He was so conscious

IN ERROR.

ALBANY,
March, 1803.

ROGERS and
Wife
v
CRUGER and
others.

IN ERROR.
·····
ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

that he had brought her surreptitiously into court that, he obtained the signature of one of her attorneys, *John Nixon*, who had been, together with *David Walker*, appointed jointly to manage the ordinary business of the estate, and who had no authority to bind her by an answer in chancery. Mrs. *Towers* also had intermarried with Mr. *Maitland*, at the time of filing the bill, which was exhibited against her as a *feme sole*. The suit had also abated by the intermarriage of the appellants, before the heirs of Mrs. *Towers* had been brought in, and the order for the revival of it against her children was irregular, and could not apply to them. When the confirmatory decree of the 21st of *May*, 1804, was entered, *Sarah Cruger*, and the children of Mrs. *Towers*, were under age, and their interests were sacrificed, by consent of the other parties, without affording the court an opportunity of examining the merits, on the report of the master, to whom it was referred to report, or stating to the court, whose peculiar province it is to protect the rights of infants, the true situation of the case.

In 11 *Ves.* 563. it is decided, that a commission must go to take the answer of an infant out of the country, and that it cannot be put in on motion; and we are told (2 *Fonblanque*, 239.) " that guardians are appointed in chancery, where such appointment is necessary for the purpose of protecting the infant's general interest, or for the purpose of sustaining a suit, or for the purpose of consenting to the marriage of the infant, and that a guardian cannot be otherwise appointed, than by bringing the infant into court, or his praying a commission to have guardians assigned him." None of these prescriptions have been obeyed; the rights of the infants have been compromitted in every stage of the proceedings, by a species of legal *hocus-pocus;* and it is now peculiarly our duty to redress their injuries, and restore them to their

inheritance. In setting aside the proceedings against them, we must also embrace those against the adults: the interests of all the heirs are identified, as against the appellants.

Lastly, in our view of the whole case, although it is proper to consider and respect the intentions of the testator, yet we ought to bear in mind that Mrs. *Rogers* took under the will more than she was entitled to by the policy of our laws. If Mr. *Cruger* had died intestate, her interest in the realty would only have been for life, and certainly he never intended that she should go beyond her third, as given by the will. He left seven children; three unmarried young ladies under age, and a widowed daughter in a foreign land. Each of these children would be to the widow comparatively poor. Parental affection, the strongest feeling of the human heart, the sacrament of nature, implanted by the deity in our bosoms, for the preservation and perpetuation of the species, is always awake and watchful over the destinies of our offspring; and it is not improbable that the last dying injunction of the testator was to guard with sacred care the inheritance and the fortunes of his children, and when on the bed of death, if his eyes were at any time diverted from another world, to the immense possessions that he was about to leave, the only consolation he could derive from the view, must have been the conviction, that his enterprise and industry had transmitted the blessings of affluence, and the advantages of fortune, to this wife and orphan children.

Without attending to the question, whether the right of transmitting our acquisitions to our children is a right derived from the laws of nature, or founded on the positive institutions of civil society; whether as occupancy is the origin of exclusive property, the right in a state of nature does not cease with the possession, and

IN ERROR,

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

*IN ERROR.*

ALBANY,
March, 1808.

ROGERS and
Wife
v.
CRUGER and
others.

determine with the life of the possessor, and his acquisitions lapse into the common and undivided property of the human race, subject to the control, and liable to the enjoyment, of the first occupant; without attending to these inquiries, which are well calculated to command our attention, and arrest our curiosity, we cannot but be convinced that every sympathy of nature, every dictate of policy, and every injunction of religion, rise up, and declare in favour of the rights of inheritance. The man who would leave his children destitute, and bequeath his estate to strangers, must be a monster in the scale of moral estimation; and although our law will not annul a will on account of a violation of those ties, which bind a parent to his child, yet it will, with avidity, embrace any circumstance that operates against his injustice, either by imputing derangement to his intellect, or supposing him the victim of fraud, and the dupe of imposture. An unequal or unfavourable distribution is liable, in degree, to the same objections, and the law will avail itself of every opportunity to support the rights of inheritance, and in all cases of doubt, decide in favour of the children against claims that may be set up by the widow beyond her dower, and the third part of the personal estate. The intention of the testator is always to be understood, to be under the government of his duty; and unless he at once, and most palpably, throws aside the feelings of a parent, and renounces the obligations of a man, he is to be supposed to possess, to cultivate, and to obey them. The appropriation to the female appellant under the will, although her conduct was no doubt a course of exemplary affection and fidelity, was far too liberal, considering that the testator had seven children; that four of these were females, three under age, and the other a widow with four orphan children in a state of infancy. This disproportion ought most certainly not to be encouraged, and the wound permitted to run into gan-

grene, by taking from the children, in the execution of the will, and adding to the gigantic portion of the appellants. Every consideration of justice revolts at this measure; and I feel a peculiar pleasure, that in forming and pronouncing this decision, my feelings as a man are in perfect harmony and correspondence with the clearest dictates of my understanding, after an attentive, an impartial, and a laborious examination of the merits of this cause.

The majority of the court concurred in this opinion; and it was thereupon ORDERED, ADJUDGED, and DECREED, that the petition of appeal exhibited by the appellants be dismissed, with costs, to be paid to the respondents by the appellants; and that the record and proceedings brought here by the said appeal, be remitted to the court of chancery, to be proceeded on according to law.